THIRD DIVISION

June 30, 2003

No. 1-01-2942

THE PEOPLE OF THE STATE OF ILLINOIS, )

)
 Appeal from the

Plaintiff-Appellee,
 )
 Circuit Court of

v.
 ) Cook County.

)

PATRICK SYKES, )

) 

                     
    ) Honorable

Defendant-Appellant,             
 )
 Joseph J. Urso,

    )
 Judge Presiding.

                

PRESIDING JUSTICE SOUTH delivered the opinion of the court:

This appeal arises from defendant's convictions of four counts of predatory criminal sexual assault, attempted first degree murder and aggravated kidnaping for his alleged assault on Girl X after a jury trial.  
He was sentenced to a total of 120 years' imprisonment: 60-year terms on two counts of predatory criminal sexual assault with concurrent 60-year terms for the other two counts, concurrent to a 30-year term for attempted murder.

On the morning of January 9, 1997, as she walked from a friend's apartment on the second floor to her grandmother's apartment on the sixth floor of the Cabrini Green housing project in Chicago, a little girl who would become known as "Girl X" was raped, strangled, had gang signs scrawled on her body, roach spray was sprayed down her throat, and she was left unconscious in a stairwell.  At 10:25 a.m., Chicago Housing Authority (CHA) maintenance worker Tarie Miller found Girl X lying facedown with a rag partially around her neck and face on the landing of the seventh-floor stairwell.  Miller went to apartments 709 and 710 to see if anyone could identify the little girl.  Sharon Thompson and Mary Johnson responded and recognized the girl.  They took Girl X to Johnson's apartment and laid her on the couch.  At that time Girl X was unresponsive and foaming at the mouth, and her eyes were rolled back into her head.  Her pants were unfastened, her underclothes were down around her ankles, her T-shirt was tied around her neck, and there was blood on her shirt.  Girl X was not wearing any shoes, and there were what appeared to be gang signs written on her stomach in blue or black marker.  Miller, Thompson and Johnson immediately called 911.

Paramedics responded within minutes to the call and were taken to apartment 710 by Miller.  When they arrived there they saw Girl X lying on the couch, breathing erratically and foaming at the mouth.  She was unresponsive, cold and rigid.  They also saw red marks on her neck.  At that time she was transported to Children's Memorial Hospital.  

When she arrived in the emergency room at 11:17 a.m., Girl X was comatose, barely breathing and unresponsive to pain or other stimuli.  Doctors noted linear red marks on her neck and red dots called Patricia, which were indicative of strangulation.  When they cut off Girl X's clothing, they saw marks on her abdomen and clotted blood obscuring her hymen.  Girl X also had several fresh puncture wounds, abrasions and lacerations on her back consistent with injury from sharp objects.  Because Girl X was having trouble breathing and had blood in her mouth, the doctors suctioned out her mouth and intubated her.  She showed signs of severe brain injury, and CT scans were ordered for her head and abdomen.  Doctors also collected a sexual assault evidence kit.  Expert examination of the contents of the kit revealed no semen on any swabs or the victim's clothes and no debris in the fingernail scrapings.  Some hairs and hair fragments were recovered from Girl X's clothing.  She was admitted to the pediatric intensive care unit (ICU).

Girl X was examined by Dr. Emalee Flaherty, an expert in child sexual abuse.  The examination revealed a lot of bleeding in the genital area with a fresh laceration to the power foresheath, lacerations and trauma to the anal area, and a laceration completely through the hymen.  Dr. Flaherty concluded that Girl X had been sexually abused with dramatic injuries and that there had been both vaginal and anal penetration consistent with having been penetrated by a penis. 

While in the pediatric ICU, Girl X was hooked up to a nasal gastric drainage tube to empty the contents of her stomach and to prevent them from going into her lungs.  Early on January 10
, nurse noticed a strange odor coming from the discharge tube and immediately notified the doctor.  The doctor inspected the tube and smelled gasoline or something similar.  The police were notified, and the doctor was asked to collect a specimen of the discharge in a glass container, which was subsequently turned over to the police.  

The police investigation of the crime began immediately, with a canvass of the residents of the building.  Detective Vernon Bradley was assigned the odd-numbered floors of the building, and between 12 and 12:30 p.m. he spoke to defendant, who lived in apartment 504 at the time.  Defendant said that he had returned home at about noon and had not seen or heard anything unusual.  Detective Bradley noted that defendant did not appear agitated or nervous and did nothing to arouse his suspicion.

Detective Bradley was also looking for a pair of boots because Girl X was not wearing her boots when she was found.  One boot was found sitting on top of a brown paper bag in the incinerator room on the first floor of the building.  The other one was found later in the room in a Dumpster.  The boots were subsequently identified as belonging to Girl X, and both the boots and the paper bag were removed and inventoried by evidence technicians.  The boots were examined sometime in January 1997, and no blood or other stains were found on them.

Illinois State Police latent fingerprint examiner Kimberly Young received and tested the brown paper bag on January 10, 1997.  The bag contained a black plastic bag containing an Eli's chocolate cake box, a Frosted Flakes cereal box, and a macaroni and cheese dinner box.  No suitable print impressions were found on any of the paper items.  One suitable palm print was found on the plastic bag, which was photographed.  That print was subsequently compared to palm print impressions given by defendant and a James Alexander, but no matches were made.  There is no automated system available for comparing palm prints.

Also in January of 1997, the paper bag was examined in the Illinois State Police lab for the presence of bloodstains.  There were no bloodstains inside the bag, but numerous red-brown stains were found on the outside of the bag, which preliminary testing indicated was blood.  A stain on the corner of the bag was determined to be human blood, while a stain in the center of the bag was not human blood.  The corner stain was tested for genetic markers, but the test was inconclusive.  A sample from the corner stain was preserved even though the quantity of stain was insufficient for DNA analysis.
(footnote: 1)
 Girl X's clothes were also examined at the crime lab.  Her T-shirt was found to be stained with her own blood; James Alexander's blood was not a match.  Her clothing was also stained with feces.  

Evidence technicians photographed the area where Girl X was found and recovered various pieces of evidence, including markers found in the elevator area and five plastic jugs filled with different liquids which were found in the upper shaft of the elevator above the top floor.  The markers were examined by the crime lab on January 10
, but no fingerprints were found.

Jack Mowicki, a chemist at the crime lab, analyzed the stomach contents recovered from Girl X.  He found medium petroleum distillate-type chemicals and a small amount of heavy distillate.  Petroleum distillates are derived from crude oil and divided into light, medium and heavy.  A petroleum distillate can be identified, but the specific product from which it came cannot be identified.  Mowicki also analyzed the contents of the five jugs found in the elevator shaft.  Four of the five samples were clearly different in pattern from the stomach contents, while the fifth had medium distillate in the same range as the stomach contents but not the heavy petroleum distillates.

In another canvass of the building on January 10
, Detective John Turney interviewed defendant in apartment 504.  Defendant said that he left his apartment at 8:10 a..m. and saw James Alexander in the hallway, who asked him where "Eddie" lived.  Mary Johnson of apartment 710 also saw Alexander around 10 a.m. when he knocked on her door and asked her in what apartment Eddie Adams lived.  She advised Alexander to go to apartment 510 but thought it strange because she thought that he knew Eddie.  The police noticed that apartment 205 was vacant but not boarded up.

Detectives William Calabrese and John Brock of Area 3 were assigned as the lead detectives in the case.  After speaking with Alexander, they spoke with defendant on January 9
 or 10
, at which time they asked him if he knew anything about what had happened.  Defendant initially said that he was not around but subsequently stated that he saw Alexander in the fifth-floor hallway, and that Alexander had asked him if he knew where Eddie was.  Defendant also told the detectives that Alexander asked him if he knew anything about a television set, to which defendant responded that he did not and left the building.

Altogether, as many as 125 police officers worked on the Girl X case.  A list of suspects was compiled that eventually contained 37 names, but defendant was not on that list.  There was no "number one" suspect at that time because almost every man and some of the women in the building were considered suspects.   Possible gang involvement was investigated, but no connection was ever established.

Earl McGee of apartment 505 was on the suspect list.  He was interviewed by the police in January, and when interviewed, he was wrapped in a towel, wearing socks and had knives inside both the socks and towel.  His apartment also contained pornographic material.

James Alexander, who was also on the suspect list, was known as "raper man" in the building.  His apartment, number 608, was searched by the police.  Blood was found on the back door that was consistent with Alexander's blood type but not with Girl X's.  A mop head was also tested but no blood was found.  His red shorts were analyzed on January 13,
 and semen stains were found, but no vaginal secretions were present.  Alexander also gave police a blood sample.  Initially, he did not tell the police that the paper bag found under the victim's boot was his, and he was not shown the bag.  However, subsequent police general progress reports indicate that Alexander later admitted that the bag was his and that he had thrown it away on January 9
.  Alexander was subsequently taken to the police station and interviewed.  During the interview, Alexander swallowed a piece of metal and had to be taken to the hospital.  He was ruled out as a suspect by March 31, 1997, because the police had no evidence linking him to the crime.

Also on the suspect list were Carl Morgan, Toricelli Johnson, and Leon Maddux, who had been a previous police suspect in an earlier assault on Girl X's cousin.

In mid-March 1997, another team of detectives assigned to the intelligence section of the organized crime unit was assigned to assist in the investigation of the Girl X case.  That team included John McHugh, Mary Green, Tom Raines, John Eshoo and Fred Wheat.  The officers first reviewed the previously generated reports of other officers working on the case.  They noted inconsistencies in defendant's statements during the initial canvass with respect to whether he saw Alexander on the day of the crime.  At that time, Alexander was a primary suspect, and defendant was a possible witness against him.

Detective Wheat attempted to find defendant by going to apartment 504 in Girl X's building and speaking to his former girlfriend, Tina Stokes.  Ms. Stokes told him that defendant did not live with her any longer, and she gave Wheat an address of 3223 W. Maypole Avenue where defendant might be found.  The police also had defendant's mother's address, and they went there and left a card with her.

On March 31, 1997, officers from the newly assigned team went to the address on Maypole Avenue to look for defendant.  Elaine Townsel told them that defendant was living with her and would be back early the next day.  That night, Townsel told defendant that the police had been by, and defendant told her that he was a witness in the Girl X rape case.

The officers returned early the next morning and saw defendant walking with Townsel and her children.  Officer Dotson spoke with defendant for a few minutes before Detective Wheat arrived.  Wheat introduced himself to defendant and told him that there were some inconsistencies in his statements concerning Alexander that needed clearing up.  Defendant knew it concerned the Girl X case.  Wheat asked defendant to come to Area 3 to speak with him and told him that he could take a bus, get a ride, or ride with him to the station.  Defendant chose to ride with Wheat because he did not have money for a bus.  Defendant rode to the station in the front passenger seat of Wheat's car.  He was never handcuffed, patted down or touched in any fashion.  

At Area 3, defendant first sat in the squad room area on the second floor where other officers and civilians were milling around.  He was there for approximately 5 to 10 minutes.  At 9:30 a.m., defendant began a 40-minute conversation with Detectives Wheat and Calabrese in a second-floor interview room.  The door was open at all times during this conversation.  Wheat advised defendant of his 
Miranda
 rights and said that he always does that with witnesses and suspects alike.  Defendant said that he understood those rights and told Calabrese that he was an epileptic, that he was on medication, and that he had taken a pill that morning.  Defendant said he got his medication by using a card, which he gave to Calabrese, who in turn gave it to Detective McHugh so that he could get defendant's medication.  McHugh returned with the medication in the afternoon and gave it to defendant.

During the first interview, defendant said that on the day of the incident he left the building at 7:15 a.m. to walk Tina Stokes to the bus stop.  At 7:30 or 7:40 a.m., he returned to the building, where he saw Alexander and a sleeping security guard in the lobby.  At 7:45 a.m., Alexander came to defendant's door looking for Eddie.  Five minutes later, defendant left the building to buy food and cigarettes.  At approximately 8:15 a.m., he returned to his apartment and then went to apartment 509 to inquire about a television set that was for sale.  He then saw Alexander on the fifth floor.  He left the building again at approximately 10 a.m. to go to the Safer Foundation to sign in, and then met Stokes downtown for lunch.  He spent the rest of the afternoon looking for a job.  Defendant returned home later that day with Stokes.  He was uncertain as to whether he knew the victim, but he may have drawn her a picture at one time.

After the interview, defendant was asked to sign consent forms for giving handwriting and hair samples, which he did.  An evidence technician arrived within 30 minutes to take pubic hair samples from him.  The door was closed and Calabrese remained in the room during the collection process, which lasted approximately 30 to 40 minutes.  Defendant was readvised of his 
Miranda
 rights, and when he pulled his pants down for the collection process, Calabrese noticed that he  had shaved his pubic area.  When asked why he had done that, defendant stated that he shaved his groin in February because he sweats.  

After the hair collection process, everyone left the interview room.  Defendant went to the bathroom, got something to drink and took a cigarette break.  No officer was with defendant during this time, and he was allowed to walk freely about the area.

At approximately 1:30 p.m., defendant gave a handwriting sample to Calabrese in the squad room, a process that lasted approximately 15 to 20 minutes.  After the sample was given, Calabrese ordered lunch for defendant.  During that process, defendant said that he done the test in an earlier case, but Calabrese did not know whether he was referring to the hair test or the handwriting test.  Defendant talked about his two earlier cases and denied making statements in those cases.

A second conversation with Calabrese in the interview room commenced at 2:30 p.m.  During this interview, defendant was shown the sign-in sheets for the Safer Foundation from January 9
, which did not show that he had signed in on that day.  Defendant stated that he did not know where he was at 8:30 a.m. on January 9
 but remembered having lunch with his girlfriend.  He also said that he wrote down his whereabouts on January 
9 and put the paper in Townsel's apartment because he knew that the police would be coming around to ask him questions.  Defendant spent the next two hours in the interview room, where he was still free to come and go, to use the bathroom and get water, which he did a few times.  No questions were asked of him during this period.

At 5 p.m., defendant spoke to Detectives Brock and Calabrese for about 20 minutes after again being advised of his 
Miranda
 rights.  Defendant indicated during this conversation that he was confused about the Safer Foundation records and about coming home with his girlfriend on January 9
.  He said that he was downtown looking for a job in the morning of the 9
th, and when he came home he saw a television truck outside, which is how he learned of the crime.  The piece of paper at Townsel's apartment had to do with his activities on the 10
th.  Defendant subsequently agreed to go to 11
th and State Street to take a polygraph exam, and Detectives Wheat and McHugh drove him there at approximately 6:30 p.m. 

The polygraph exam was administered by Officer Tovar.  Prior to the exam, defendant signed a consent form and a 
Miranda
 waiver.  Tovar then interviewed defendant about his background.  During the exam, Tovar asked defendant about Girl X and determined that defendant was being deceptive.  After the exam, Tovar informed the detectives that he detected deception in defendant's exam.

Defendant was taken back to Area 3 shortly before 10 p.m.  At 11:30 p.m., he was again advised of his 
Miranda
 rights and told that deception had been indicated on his polygraph exam.  Defendant was not, however, asked if he was involved in the crime.

At 2:30 a.m., Detectives Wheat and McHugh began another 40-minute interview with defendant.  They first discussed sports and defendant's prior cases before talking about the Girl X case.  Wheat told defendant that his alibi had fallen apart because the Safer Foundation records did not match his story.  Shortly thereafter, Wheat left the room to tell Calabrese that defendant was confessing to the crime.

Detective Wheat went back to the room, and defendant relayed the following during a 40-minute conversation: On January 9
, defendant heard a knock on the door, and when he opened the door, a little girl was standing there.  She said that she was being followed and that she was scared.  Defendant let her into the apartment.  Because the girl did not want to go to school, defendant let her stay.  They both sat on the couch, and defendant turned on the television.  The girl began to touch defendant, and he touched her also.  The television was knocked over and defendant asked the girl to leave because he was afraid.  The girl said she would tell people what he had done to her if she was not allowed to stay.  Defendant went to the bathroom, and when he returned, the girl had removed her shirt.  He sat down next to her on the couch, and they began  touching each other again.  She took defendant's hand and placed it between her legs.  Defendant  told her again that she would have to leave and that he was afraid that he would get into trouble.  He went to the bathroom again, and when he returned this time, the girl had removed the rest of her clothing.  Defendant again tried to make her leave, but she said that she would go to the window and scream.  They sat on the couch again, and defendant inserted his finger into the girl's vagina and moved it around, at which point she began to move with him.  Defendant then put his finger into her rectum for a minute or so.  The little girl asked him to take out his penis so that she could touch it.  He took out his penis, and the girl sucked on it for about a minute when defendant stopped her and told her that she had to go.  The girl began to scream, and defendant put his hand over her mouth to stop her.  When she did not stop, he began choking her.  After awhile, the girl lay lifeless, and he tried to dress her.  The girl regained consciousness and began screaming again, so he choked her again until she was rendered unconscious.  He finished dressing her and put her over his shoulder and took her from the apartment up a couple of floors and placed her on the landing.  He took a marker and drew a pitchfork, the letters "G D" and some other letters on her stomach.  He also put her shoes on her stomach.  Defendant left the girl, went down to an apartment on the second floor and got a can.  He then went back upstairs to where he had left the girl and sprayed fluid from the can into her mouth and discarded the can in the second floor apartment.    

At 3:15 a.m., Calabrese joined Wheat and McHugh for an interview of defendant.  Defendant was again advised of his 
Miranda
 rights and repeated the statement that he had just given to McHugh and Wheat in which he stated that he was the perpetrator of this crime.  This conversation lasted about 45-minutes, after which the officers again left him in the room with the door open.  Defendant motioned for McHugh to come back, at which time he stated that he had lied about a few things in his previous statement.  He then said that he grabbed the girl and pushed her into the apartment, that she had "messed" on herself, and that he threw her shoes down the garbage chute.  Defendant was asked if he needed anything, and he was given a blanket, some cigarettes and locked in the interview room for the first time. 

At 8:30 a.m. on April 2, 1997, Detective Brian Killacky introduced himself to defendant and gave him food, something to drink and cigarettes.  At 11:15 a.m., Killacky and Wheat went to the conference room and again advised defendant of his 
Miranda
 rights, which he said he understood.  Defendant ate some pizza and then discussed the case with the detectives for 20 to 25 minutes.  

Defendant said that he was 25 years old and lived in apartment 504 at the time of the crime.  On the morning of the offense he walked his girlfriend to the bus stop.  He returned to the fifth floor and saw a young girl walking up the stairs.  He grabbed the girl and took her into his apartment and closed the door.  He pulled the girl's pants off, inserted his right index finger  into her vagina and rectum and became sexually aroused.  The girl began crying at that time.  Defendant unzipped his pants and unsuccessfully attempted to put his penis into her vagina.  He insisted that she open her mouth, and he placed his penis in her mouth for a minute or two.  The girl began to scream and cry.  Defendant then put his hands around her throat and began to choke her.  He smelled and then observed feces on the little girl.  Defendant walked to the front door and looked out, pulled up the girl's pants and carried her upstairs.  He then took a marker that he had found when he came back from the bus stop and wrote "TWS," "GD" and drew a pitchfork on her stomach.  He then went downstairs to an abandoned apartment and got a red and white can of TAC or TAT roach spray and went upstairs and sprayed its contents into her mouth.  The girl started spitting up.  Defendant left her, and on the way back to his apartment, he ran into Alexander.  After returning to his apartment, defendant noticed that he had left the girl's boots there, so he took them out but did not remember where he took them.  He went back to his apartment, and it was at that time that Alexander knocked on the door.  After that, he changed clothes.  After this conversation, defendant had cigarettes and a soda, and the detectives left to notify felony review.

At 12:15 p.m. Wheat and Killacky spoke to defendant again and asked him why he sprayed the stuff into the girl's mouth.  Defendant said that he thought he had leaked or ejaculated into her mouth.  The reason he wrote on her stomach was because he had seen that type of writing in the building.  He put the can in an abandoned apartment immediately off of the stairwell on the second floor.  That information was relayed to other officers who went to the building to look for the can.

Assistant State's Attorney (ASA) Robert Buckley arrived at Area 3 sometime after noon on April 2, 1997, to assist the detectives with the preparation of search warrants.  At 3:30 p.m., defendant was interviewed by Detectives Killacky, Wheat and ASA Buckley in a large conference room.  After ASA Buckley advised defendant of his 
Miranda
 rights, a 30- to 45-minute conversation took place.

At around the same time, Detectives Alonzo Jackson and Vernon Bradley went to Cabrini Green to look for the can of roach spray.  They went to apartment 205, which had since been boarded up, and subsequently found a red can with TAT written on it in black letters.

At approximately 6:30 p.m. defendant identified the can of roach spray that he had used to spray down the victim's throat.  Shortly after midnight on April 3
, ASA Buckley had a conversation with defendant alone in which he asked defendant how he had been treated.  Defendant stated that he had been allowed to use the bathroom, to smoke, drink, eat and sleep.  He had also been allowed to take his epilepsy medication and was not under the influence of alcohol or any other drugs.  ASA Buckley asked defendant if he needed anything else and if he wanted to document his statement.  Defendant elected to have a handwritten statement.

At 1 a.m., ASA Buckley wrote out defendant's statement.  Defendant signed the rights waiver contained in the statement and signed the statement on each and every page.  This process lasted 40 minutes, during which time a picture was taken of defendant, and defendant identified pictures of the can of roach spray and of Girl X.

In the handwritten statement, defendant stated that he was 25 years old and that his date of birth was January 23, 1971.  On January 9, 1997, defendant lived with his girlfriend, Tina Stokes, in apartment 504 in Cabrini Green.  That morning, defendant walked Stokes to the bus stop and then went back to the apartment.  He was standing on the porch when he saw Girl X walking upstairs wearing a pair of pants and a white shirt.  He grabbed her and pulled her into the  apartment and locked the door.  He took her to the couch in the front room, pulled her pants down and put his right index finger into her vagina and rear end.  He got an erection and tried to put his penis into the girl's vagina for about a minute, but she began crying.  Tears were coming from her eyes, and she was whimpering but stopped.  He then put his penis into the girl's mouth.  The girl sucked on his penis for about a minute then began screaming.  He did not want her to scream, so he put his hand over her mouth, but she kept screaming, so he put his hands around her neck and began choking her.  As defendant choked her,  he smelled and saw her going to the bathroom and feces coming out of her.  He choked her for awhile, and then she stopped screaming.  

Girl X was still breathing, and it appeared as though she was sleeping.  Defendant set her down on the floor in the front room and pulled up her pants.  He then walked to the front door and looked out.  When he did not see anyone, he put Girl X over his shoulder and carried her to a place in the stairwell between the sixth and seventh floors.  He then set her down and took a marker that he had found when he came back from the bus stop and wrote "TWS," "GD" and drew a pitchfork on her stomach.  He was not a member of a gang and did not know what the letters meant.  

Defendant further stated that he went downstairs to an abandoned apartment on the second floor to look for something to spray into the girl's mouth because he was afraid that he had left something in her mouth when he removed his penis.  He found a red and white can of TAC or TAT, which he took back to where the girl was lying.  He put the tube into her mouth and pushed the button, and the contents smelled like roach spray.  Girl X began to spit up like a baby and some of the liquid came out of her mouth.  Defendant then left and took the can back downstairs to the vacant second-floor apartment.   

As he was returning to his apartment, he saw Alexander on the landing.  Back inside the apartment, he noticed that he had forgotten the girl's boots, so he took them up to the sixth floor and threw them in the Dumpster.  He returned to his apartment and changed his clothes.  It was then that Alexander knocked on the door looking for Eddie.  Defendant later threw out the marker near an abandoned CHA building. 

At the end of the statement, defendant said he came to the police station voluntarily with Detective Wheat and that he had been treated well by the police and the ASA.  He was given a pizza and a hamburger to eat, pop to drink and cigarettes to smoke.  He had also been allowed to sleep and to use the bathroom and was given his epilepsy medication.  Defendant also expressed remorse for what he had done.

At 3:30 p.m., ASA Buckley had another conversation alone with defendant.  Buckley wanted to get some more information about where defendant had obtained the roach spray, about the writing on Girl X's stomach, and how defendant knew her.  After this conversation, defendant said he wished to give another written statement, which was again written up by the ASA and signed by defendant and the detectives.  This statement was prepared in an administrative office using the same procedures as were used during the taking of the previous handwritten statement.  Defendant also drew a picture of a pitchfork on one of the pages.

In the second written statement defendant stated that some of his prior statement was not true.  He had been afraid of getting Stokes into trouble, so he said that he had gotten the spray from the second floor when in fact he had gotten it from a shelf between the bathroom and the bedroom in apartment 504.  He stated that in addition to choking the girl he put her on the floor and put his foot across her throat.  He sprayed the spray into her mouth while they were still in the apartment.  Defendant wrote on Girl X's stomach because he wanted it to look like a gang member had done it.  He knew that GD stood for Gangster Disciple and that the pitchfork is their symbol.  The marker was thick, not like the one he used to draw.  He threw the marker towards an abandoned CHA building as he walked towards Clark and Division Streets.  

During the entire time defendant was at Area 3, he never asked to make a phone call, to leave or to see Elaine Townsel.  He was given cigarettes, food and pop.  Defendant was never verbally or physically abused at any time, nor was he threatened or promised anything in exchange for his statement.  He appeared calm and cooperative, never exhibited any signs of a seizure or complained that he had suffered a seizure.  Defendant was alert, talkative, friendly and coherent and did not appear disoriented.  He was never handcuffed while he was in the interview room.

On April 3
, Mowicki analyzed the contents of the aerosol can of roach spray and recovered medium petroleum distillate and a small amount of heavy petroleum distillate.  This extraction was consistent with the stomach contents of Girl X and different from the samples of any of the jugs recovered in the elevator shaft.

Hair samples were taken from defendant's head, sideburns and mustache.  Evidence technicians and detectives subsequently gathered debris samples and some bottles from apartment 205.  From apartment 504 they recovered a futon mattress, pillows, toiletries, shoes, boxer shorts, a rug, debris from a closet, some head hairs from Tina Stokes, fibers from a wig and an envelope.  All of these items were tested at the crime lab, but no evidence was discovered linking defendant or anyone else to the crime or linking Girl X to the crime scene.

Defendant was subsequently transferred to Cook County jail, where on April 4
 he was examined by an intake nurse.  Defendant told the nurse that he was taking Dilantin and another medication, and that he had last taken Dilantin the day before.  A blood sample from defendant taken later that day indicated a level of Dilantin at .346, with a recommended level being 10 to 20.

After defendant's arrest, the police compared samples of his hair with hairs recovered from Girl X's clothing.  From Girl X's boots, the examiners found six Negroid head hairs, but all were dissimilar to any standards given in this case.
(footnote: 2)  Two head hair fragments from Girl X's underwear and leggings and a small pubic hair fragment were also dissimilar to any of the standards.  Four head hair fragments were found in Girl X's pants and socks, one of which was consistent with Girl X's hair, the others were inconsistent with any of the standards.  One head hair consistent with Girl X's hair was found on her shirt, while nine head hairs were dissimilar to all of the standards.

Tina Stokes testified that defendant had walked her to the bus stop at 7:15 a.m. on January 9, 1997, and was wearing a T-shirt, jogging pants, sneakers with no socks and a green parka.  Defendant did not visit her at work that day but called her to say that the police had spoken to him about an attack on a little girl.

Girl X was transferred to Schwab Rehabilitation Institute in February 1997, where she began to emerge from her coma.  At Schwab, the staff made a concerted effort to ensure a media blackout and to keep any information concerning her attack from Girl X.  The staff did not allow Girl X to be exposed to any radio or television, and there was a restricted visitors list prepared by Girl X's mother.  By April 1997, psychologist Carolyn Reeder was able to get Girl X to use a device to register yes and no answers to questions.  Girl X was 100% accurate in reporting personal information; however, she did not know why she was in the hospital or why she could not see or talk.  Also in April, Girl X received a gift from another girl who had been raped, and Girl X became upset when she heard the word "rape."  Reeder asked Girl X if she had been hurt by a man, and Girl X responded that she was afraid that he would come back and hurt her again.

Throughout April 1997, Girl X continued to be scared of being alone, she had nightmares, was easily startled and cried a lot.  Reeder asked her if it was because of what happened to her, and Girl X responded yes.  Reeder told her that the man who hurt her was in jail and could not get out but did not give her any names or details. 

Girl X was subsequently discharged from Schwab and went home.  One day, Girl X was crying and screaming, and her mother asked her if she wanted to talk about what happened to her.  Reeder had previously told the mother that Girl X might begin having memories of the assault.  Girl X's mother named all of the men in the building, beginning with the seventh floor and working downwards.  When she got to the fifth floor, Girl X indicated that the man in apartment 504 who liked to draw was the attacker.  Her mother contacted Detective Wheat and told him he had the right man after all.  Prior to that time, the mother felt that the police had arrested the wrong man.

In September 1998, a school social worker, Carolyn Franklin, called Girl X's mother and told her that Girl X was relating an account of the attack.  Her mother told Franklin to ask her if it was the man who lived across form the incinerator chute who used to draw.  Girl X responded that the man grabbed her and forced her into the apartment on the fifth floor across from the incinerator. 

Lori Smith, a child abuse specialist working for the Cook County State's Attorney's office, met with Girl X eight times before trial.  Smith did not know any details about the crime when she first met with her.  Smith determined that Girl X could tell the truth from a lie.  On April 20, 1999, Girl X relayed to Smith that a man on the stairs offered her some fruit and that she went with him to apartment 504.  He took her to the bedroom, and she began crying.  The man pulled a knife from his shirt and made her "suck dick."  At this point, Girl X stopped responding.

By March 2001, Girl X was able to communicate using an eye gaze system.  Barbara Robinson, an expert in speech pathology, explained the eye gaze system at trial.  The eye gaze system is commonly used for people who cannot see or hear.  The system relies on each individual's yes-no response system.  For Girl X, her eyes would go way up, indicating yes, and for no, she would shake her head and look down.  The alphabet is divided into three blocks:  A-H, I-Q and R-Z.  A questioner begins by asking if the letter is in the beginning, middle or end of the alphabet, then within each block, the questioner goes successively through the letters until a yes response is obtained.  

Girl X testified at trial using this system.  She indicated that on the date in question she walked to her grandmother's apartment.  When she got to the fifth floor, she saw defendant standing on the landing.  She had seen him before sitting on a crate and drawing pictures.  The man asked her if she wanted a banana, and she said yes.  She then followed him to apartment 504 and into the living room.  There was no one else in the apartment.  The man closed the door and stood in front of her.  When he pulled out a pocket knife, she tried to leave, but the door was locked.  The man grabbed her by the arm, and she struggled with him.  They went into the bedroom, and the man told her to get on the bed.  The man touched her vagina with his hands.  She asked him if she could go to school.  The man told her to "suck his dick" and put his penis in her mouth before "pee[ing]" in her mouth.  He then took his penis out of her mouth and covered her face with blankets.  She could not scream or breathe and did not remember coming out of that room.  Girl X testified that she knew James Alexander who lived on the sixth floor, but he was not the man who did those things to her.  

John Davis, a resident of apartment 405, testified that on January 9
 between 7 and 8 a.m., he was on the way to the store when he saw Girl X on the stairwell near the fifth floor.  There was a man on the stairs in front of her wearing a beige trench coat, but Davis could not see his face.  Davis had, however, told Detective Jackson on January 10
 that he had not heard or seen anything that day.

Defendant testified that he was 29 years old and that his date of birth was July 23, 1971.  He stated that he has epileptic seizures and takes Dilantin three times a day.  He had prior convictions for armed robbery and attempted sexual assault.  In January 1997, he was living with Tina Stokes in apartment 504 across from the incinerator chute.  He did not know Girl X and never belong to a gang.   He used to sit on a crate, and children would watch him draw cartoons.

On the morning of January 9
, he walked Stokes to the bus stop and went back to the apartment around 8 a.m. and did not leave again that day.  Alexander knocked on the door and asked where Eddie stayed.  Later that day, a white police officer asked him if he had heard anything and said that a little girl had just been raped.  Defendant did not tell him that he had seen Alexander because "when something happens, it's not too healthy to talk to the police."  

By March 31, 1997, defendant was living at 3222 W. Maypole Avenue with Elaine Townsel.  On that day, Townsel told him that police had come by looking for him, and he assumed that it was about his being robbed, not about Girl X.  The next day, he was approached by police on the street who said he needed to go to the police station to identify James Alexander from a lineup.  He went voluntarily to the station and was not handcuffed.  He had not eaten, nor had he taken his medication.  He was given food, beverages and cigarettes while at the police station.

While at Area 3, defendant never slept and never took Dilantin.  He told the police about his epilepsy and gave McHugh his medical card.  Later McHugh showed him a bottle they claimed was Dilantin, but he never saw it.  Defendant said that he was confused about the dates but never admitted having anything to do with Girl X.

Defendant also testified that he never read the statements which he signed, and that he signed the papers after he had a seizure.  He fell on the floor of the holding cell during a seizure and was picked up off the floor by the detectives, and cold water was splashed in his face.  The ASA did not read the statement to him, and while he did sign the 
Miranda
 waiver, someone else signed his name on all of the other pages of the first statement.  Defendant testified that he did not sign the second statement at all, nor did he draw a pitchfork on that statement.  He admitted that he was okay when he was speaking to the police officers about the crime, but he had a seizure before he signed the papers.  Defendant also testified that he did not own a beige trench coat in 1997, that he knew what TAT was, and that when he arrived at the jail on April 4, 1997, he told the nurse that he had taken his medication the day before.

The jury convicted defendant on all counts, and he was sentenced to a total of 120 years in prison.

Various pretrial motions were disposed of by the trial court and they will be discussed in further detail below as they relate to the issues which defendant has raised. 

Defendant has raised a number of issues on appeal: (1) whether he was deprived of his rights under the fifth, sixth and fourteenth amendments of the United States Constitution and article I, sections 2 and 8, of the Illinois Constitution of 1970 when the trial court denied his motion to dismiss based upon the State's destruction of potentially exculpatory evidence; (2) whether the court erred in denying his motion to allow a defense expert to conduct a physical and cognitive examination of Girl X; (3) whether the trial court erred in denying his motion to suppress his two written statements; (4) whether the trial court erred in denying his motion to bar the State from impeaching him with evidence of a prior conviction; (5) whether the trial court erred by preventing him from conducting a cross-examination of certain witnesses; (6) whether the trial court erred in admitting certain photographs into evidence; and (7) whether defendant was proven guilty beyond a reasonable doubt.

Destruction of Evidence

Defendant first contends that the trial court committed reversible error by denying his motion to dismiss the indictment as a discovery sanction because of the State's "reckless" destruction of "critical" evidence.  He argues that the trial court erred by requiring a showing of bad faith as a prerequisite to granting relief on his due process claim.  Defendant also argues that the trial court abused its discretion by failing to dismiss the indictment as the proper sanction for the State's destruction of evidence.  Defendant relies on 
People v. Newberry
, 166 Ill. 2d 310 (1995), to support his contention.

The State, which conceded during oral argument that it bore the responsibility of notifying police of the court's order to preserve all evidence, nevertheless contends that the destruction of the evidence was not done in bad faith and that defendant was not prejudiced by that conduct because the evidence was not outcome determinative.

The due process clause of the fourteenth amendment makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  
Arizona v. Youngblood
, 488 U.S. 51, 57, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988).  However, unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.  
Youngblood
, 488 U.S. at 58, 102 L. Ed. 2d at 289, 109 S. Ct. at 337; 
People v. Harris
, 182 Ill. 2d 114, 147 (1998); 
People v. Newberry
, 166 Ill. 2d 310, 315 (1995); 
People v. Campbell
, 252 Ill. App. 3d 624, 630 (1993).

In the case at bar, within a few hours of the attack on Girl X, the police collected over 150 pieces of evidence during their investigation, including the victim's boots, a brown paper bag spattered with reddish-brown stains, and two markers.  The boots were examined in January 1997, and no blood or other stains were found on them.  The paper bag was tested for fingerprints and  the presence of blood in January 1997, and although the test indicated that human blood was present, there were insufficient DNA markings to identify the source of that blood.  A portion of one of the stains from the bag was again tested in August 2000, using a more advanced test, which again yielded an inconclusive result.  The markers were also tested for fingerprints in January 1997 with inconclusive results.

Defendant was arrested in April 1997, and his initial discovery request was filed on May 16, 1997.  On June 20, 1997, in response to a defense motion, the trial court entered an order that all evidence collected in the case was to be maintained.  However, all of the aforementioned evidence was destroyed pursuant to police procedure
(footnote: 3) between January and April 2000. 

Defendant subsequently filed two motions to dismiss the case, one on October 16, 2000 (while represented by the Cook County public defender), and one on December 13, 2000 (filed by current counsel).  Both motions requested the dismissal of the case as a discovery sanction for the State's destruction of evidence in the case. 

In denying defendant's motion, the trial court found that the destroyed evidence was not potentially useful or evidence of the crime itself which would determine the outcome of the case.  The court ruled that because the destruction of the evidence was inadvertent and not done in bad faith, there was no due process violation.  The trial court did, however, grant defendant's motion to give a jury instruction allowing the jury to draw a negative inference from the State's lack of physical evidence:

"If the People have failed to offer evidence within its power to produce, you may infer that the evidence would be adverse to the People if you believe each of the following elements:

1.  The evidence was under the control of the People and could have been produced by the exercise of reasonable diligence.

2.  The evidence was not equally available to the defendant.

3.  A reasonable prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.

4.  No reasonable excuse for this failure has been shown."

While defendant characterizes the destroyed evidence as "critical," the record does not support that characterization.  The record clearly establishes that every test available to be performed on the evidence was done, and inconclusive results were yielded.  Thus, the destroyed evidence neither incriminated nor exonerated defendant, and we are presented with the scenario in 
Youngblood
, where the evidence can at best be described as potentially useful.  In such a case, a defendant must demonstrate bad faith on the part of the prosecution, which he has failed to do.  The court found that the destruction of the evidence was due to a bureaucratic snafu, and we will not disturb that finding.   It follows then that the trial court did not err in requiring a showing of bad faith before declaring a due process violation.

Defendant makes a related argument that the State's destruction of the evidence was a discovery violation mandating the dismissal of the indictment as a sanction.  He argues that the holding in 
Newberry
 mandates a dismissal because the State violated an existing court order to preserve all evidence in the case.  However, the 
Newberry
 case is distinguishable. 

 In 
Newberry
, the defendant was charged with drug possession.  Initial testing of the seized substance yielded a negative result for the presence of drugs, and defendant was charged with unlawfully possessing a look-alike substance with intent to distribute.  
Newberry
, 166 Ill. 2d at 312.  A subsequent laboratory test conducted one month after the defendant's arrest yielded a contrary result, namely, that the substance was cocaine.  
Newberry
, 166 Ill. 2d at 312.  Defendant was then charged with various offenses related to the unlawful possession of a controlled substance with intent to deliver, and the look-alike drug charge was dropped.  
Newberry
, 166 Ill. 2d at 312.  The defendant filed a written discovery motion pursuant to Supreme Court Rule 412 (188 Ill. 2d R. 412), which included a request to examine all tangible objects that had been seized from him.  
Newberry
, 166 Ill. 2d at 312.  A year later, the parties learned that the substance had been destroyed by an evidence technician who, when he saw that the look-alike drug charge had been dropped, mistakenly assumed that the case against the defendant was over and that the substance was no longer needed.  
Newberry
, 166 Ill. 2d at 313.

In distinguishing 
Youngblood
, the 
Newberry
 court noted that in the instant case, the evidence was "essential to and determinative of" the outcome of the case.  
Newberry
, 166 Ill. 2d at 315.  The court further noted that defendant could not be convicted of the drug possession charges without proof of the content of the disputed substance and that he had no realistic hope of exonerating himself without the opportunity to have the substance examined by his own experts.  
Newberry
, 166 Ill. 2d at 315.  Here, as the trial court noted, the destroyed evidence was not essential to and determinative of the outcome of the case.  On the contrary, it was inconclusive and neither inculpated nor exculpated defendant.  The 
Newberry
 court held that when evidence is requested by the defense in a discovery motion, the State is put on notice that the evidence must be preserved, and if it proceeds to destroy the evidence, appropriate sanctions may be imposed even if the destruction was inadvertent, without a showing of bad faith.  
Newberry
, 166 Ill. 2d at 317.  The court in 
Newberry
 relied on the holding in 
People v. Koutsakis
, 255 Ill. App. 3d 306, 311 (1993), which stated that when there is a request for specific evidence, a defendant does not need to show the exculpatory value of the evidence because the specific request puts the State on notice to preserve the evidence.  

Supreme Court Rule 415 provides the trial court with several sanctions for the violation of a discovery rule (134 Ill. 2d R. 415), and once a trial court has determined that a discovery violation has occurred, the court may impose any sanction that, in its discretion, it deems just.  
Koutsakis
, 255 Ill. App. 3d at 312.  The correct sanction to be applied for a discovery violation is a decision appropriately left to the discretion of the trial court, and its judgment shall be given great weight.  
Koutsakis
, 255 Ill. App. 3d at 312.  We note that contrary to defendant's assertions, 
Newberry
 does not imply that the only available sanction for the destruction of evidence was to dismiss the indictment, only that the sanction chosen in that case was properly within the trial court's discretion.

In the case at bar we are unable to say that the trial court abused its discretion by failing to dismiss the indictment.   Instead, the trial court chose to grant defendant's request that an instruction be given to the jury advising it that it may presume that the destroyed evidence would have tended to exculpate him of the crime, and it was within the court's discretion to fashion that particular sanction for the State's discovery violation.  

Although we have essentially found in the State's favor on this issue, we feel compelled to admonish the State that its conduct in failing to notify police of a standing court order to preserve all evidence in this case is unacceptable.  The State was clearly aware that the case had not yet gone to trial  and in its own words at oral argument "dropped the ball" in preserving the evidence.  Such conduct is not looked upon favorably by this court.   The State is called upon to reexamine its procedures of cataloging and communicating with the police department about evidence in order to insure that such actions do not recur.

Examination of Girl X

Defendant's next contention of error is that the trial court committed reversible error by 

denying his motion to allow a defense expert to conduct a physical and cognitive examination of Girl X.  He argues that he had no opportunity to determine whether the victim was a competent witness before she testified and that the extent of her injuries prevented the defense from cross-examining her.  Defendant essentially argues that he wanted his own experts to examine Girl X to determine if the eye gaze system was an independent form of communication.  He relies on 
People v. White
, 40 Ill. 2d 137 (1968), to support his contentions.  In a related issue, defendant argues that the trial court erred by allowing the victim to testify, and that the denial of his request to examine the victim violated his right to present witnesses. 

The determination of whether a witness is competent is within the sound discretion of the trial court.  
People v. Rainge
, 211 Ill. App. 3d 432, 446 (1991).  In determining whether a witness is competent to testify, a trial court is to consider four criteria: (1) ability of the witness to receive correct impressions from his senses; (2) ability to recollect these impressions; (3) ability to understand questions and express answers; and (4) ability to appreciate the moral duty to tell the truth.  
People v. Seel
, 68 Ill. App. 3d 996, 1004 (1979).  Unless testimony at trial establishes that the witness did not meet the criteria for competency, that testimony cannot establish that a determination of competency constituted an abuse of discretion.  
Seel
, 68 Ill. App. 3d at 1005. Where a witness's mental capacity is called into question, the mental abnormality being inquired of must be relevant to attacking the witness's ability to perceive, record, recollect, or narrate.  
Rainge
, 211 Ill. App. 3d at 446.  Otherwise, the question is not of the competency of the witness but the credit to be attached to his testimony.  
Rainge
, 211 Ill. App. 3d at 447. 

Here, the record establishes that defendant never requested a competency hearing.  There was, however, extensive testimony regarding the method that Girl X used to communicate, an eye gaze system, due to the extensive nature of her injuries.  By using that system and an interpreter, the victim was able to testify in court.  Defendant does not argue that the victim did not meet the tests of legal competency, only that her injuries made it difficult to cross-examine her.  However, a witness's inability to speak does not render her incompetent to testify or violate the defendant's right to cross-examine witnesses so long as she is able to communicate the facts by other methods and otherwise meets the tests of legal competency.  
People v. Spencer
, 119 Ill. App. 3d 971, 979 (1983).  Girl X was able to testify using the eye gaze system, and once the system was explained, the record demonstrates that everyone, including defense counsel, was able to discern the victim's answers based upon the use of that system.  Therefore, we find that the trial court did not err in denying defendant's motion to allow a defense expert to conduct a physical and cognitive examination of the Girl X.

Defendant's reliance on 
White
 is misplaced.  In that case, the sole witness to a theft was a nursing home patient who could hear but could not speak.  
White
, 40 Ill. 2d at 138.  In reversing the defendant's conviction, which was based solely on her testimony, the court noted that there were "grave doubts" as to the witness's competency and susceptibility to influence, and that the only way she could communicate was to raise her knee if her answer was yes and remain still if her answer was no.  
White
, 40 Ill. 2d at 139.  The court further stated that "[t]he witness had no means of originally communicating an accusation.  She was unable to state what she saw nor could she describe the [article stolen] or the person who took it."  
White
,
 
40 Ill. 2d at 139.  The court ruled that, under the circumstances, the defendant's right to cross-examine the witness was violated.  
White
, 40 Ill. 2d at 139.  

In the instant case, Girl X was the sole eyewitness to the crime committed upon her and was unable to communicate verbally, similar to the witness in 
White
.  However, unlike the witness in 
White
, Girl X had a great capacity for communication in that she was able to utilize a communication system called the eye gaze system, which allowed her to spell out words using the letters of the alphabet.  Because she was able to communicate by other means and was otherwise competent, we reject defendant's contention that his constitutional right to confront witnesses was violated.  Likewise, the denial of defendant's motion to examine the victim did not violate defendant's right to present witnesses because even where a competency determination is to be made, due process does not require an examination of the witness by the challenging party.  
People v. Williams
, 147 Ill. 2d 173, 211-12 (1991).  

Motion to Quash Arrest and Suppress Statements

Defendant next contends that the trial court erred in denying his motion to suppress the 

two written statements "allegedly" signed by him during his "56-hour" detention at the police station on the grounds that the statements were inadmissible and involuntary.  He argues that he suffered an epileptic seizure during his detention and that his bloodstream indicated "dangerously low" levels of Dilantin.  Defendant also argues that the two statements are so "inherently inconsistent" that they could not have come from the perpetrator of this crime and notes that his birth date was incorrectly stated in both statements.  

The trial court denied the motion after an extensive hearing, finding that there was no evidence in the record to show that the statements were involuntary or the result of compulsion or inducement.    

In reviewing whether defendant's confession was voluntary, great deference will be given to the trial court's factual determinations, and those findings will be reversed only if they are against the manifest weight of the evidence.  
In re G.O.
, 191 Ill. 2d 37, 50 (2000).  However, the ultimate question of whether the confession is voluntary is reviewed 
de novo
.  
In re G.O.
, 191 Ill. 2d at 50.  

For a confession to be admissible at trial, it must be free, voluntary, and not obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.  
In re A.R.
, 295 Ill. App. 3d 527, 532 (1998).  The test for the voluntariness of a confession is whether, under the totality of the circumstances, the statement was made freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed.  
People v. Gilliam
, 172 Ill. 2d 484, 500 (1996).  Factors to consider when determining voluntariness include: the defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises.  
Gilliam
, 172 Ill. 2d at 500-01.  The State has the burden of establishing the voluntariness of the defendant's confession by a preponderance of the evidence.  
Gilliam
, 172 Ill. 2d at 501.    

 Turning to the facts of this case, we conclude that the totality of the circumstances indicates that defendant's confession was voluntary.  The evidence at the hearing established that, contrary to defendant's assertions on appeal, he was not in "detention" for 56 hours.  On the contrary, he was at the police station for 18½ hours before he made the incriminating statements.  There were interviews, tests, and samples taken, and defendant was transported to 11
th and  State Street, where other tests were performed.  Moreover, defendant was initially present at the police station as a witness and was allowed to move freely about the station during his interview.  The trial court found that the mere fact that defendant was given his 
Miranda
 warnings before the initial interview did not indicate that he was in custody at that point.  The trial court specifically found, and we agree, that defendant was in custody only after his alibi was refuted and defendant made inculpatory statements.  Those findings are clearly supported by the record and are not against the manifest weight of the evidence.  We conclude that defendant's statements were made voluntarily and that he was not coerced into making the inculpatory statements.  Accordingly, the trial court did not err by denying defendant's motion to quash his arrest and suppress evidence.

Motion to Exclude Evidence of Prior Conviction

Defendant next contends that the trial court abused its discretion by denying his motion to

exclude evidence of his 1992 conviction for armed robbery and attempted criminal sexual assault.  He sought to have that information barred because the conviction was not probative of his credibility.  The trial court denied the motion and limited the admissibility of the conviction to impeachment purposes only.  Defendant argues that evidence of his prior conviction should have been excluded because it was highly prejudicial given its strong similarity to the crimes charged.

The admission of a prior conviction to impeach the credibility of a witness is governed by the test established in 
People v. Montgomery
, 47 Ill. 2d 510 (1971).  For the purposes of attacking credibility, evidence of a prior conviction is admissible if: (1) the crime was punishable by death or imprisonment for more than one year, or the crime involved dishonesty or false statement regardless of the punishment; (2) less than 10 years have elapsed since either the conviction or the witness's  release from confinement, whichever is later; and (3) the probative value of the conviction outweighs the danger of unfair prejudice.  
Montgomery
, 47 Ill. 2d at 516, 519; 
People v. Williams
, 173 Ill. 2d 48, 81 (1996); 
People v. Diehl
, 335 Ill. App. 3d 693, 702 (2002).  The third factor requires the trial court to perform a balancing test, taking into consideration factors such as the nature of the prior offense, its recency and similarity to the present charge, the length of the criminal record, and the age and circumstances of the witness.  
Diehl
, 335 Ill. App. 3d at 702.  If the trial court determines that the prejudice substantially outweighs the probative value of admitting the evidence, then the evidence of the prior conviction must be excluded.  
People v. Atkinson
, 186 Ill. 2d 450, 456 (1999).  The determination of whether a witness's prior conviction is admissible for impeachment purposes is within the discretion of the trial court.  
Atkinson
, 186 Ill. 2d at 456.  

We find that the trial court did not abuse its discretion in admitting defendant's prior conviction of armed robbery and attempted criminal sexual assault for impeachment purposes pursuant to the 
Montgomery
 rule.  Defendant's prior conviction was admissible pursuant to the first prong of the 
Montgomery
 rule because it was a crime punishable by more than one year of imprisonment.  In addition, the prior conviction was less than 10 years old.  The trial judge was, therefore, required to weigh the probative value of admitting the prior conviction against the danger of unfair prejudice.  Defendant's testimony at trial was virtually his entire defense.  For that reason his credibility was a central issue, and the prior conviction was crucial in measuring his credibility.  Similarity between the prior conviction and the offense charged does not mandate exclusion of the prior conviction.  
Atkinson
, 186 Ill. 2d at 463.   Instead, similarity is merely a factor for the trial court to consider in the course of balancing probative value against unfair prejudice.  
Diehl
, 335 Ill. App. 3d at 704.  Moreover, the jury was instructed to consider defendant's prior conviction only for the purpose of assessing his credibility as a witness and not as evidence of guilt of the offenses charged.  The trial judge did not abuse his discretion in finding that the probative value of admitting this conviction was not outweighed by the danger of unfair prejudice to the defendant.  

Evidentiary Errors

Defendant's next contention is that the trial court committed numerous evidentiary errors that prejudiced him, requiring a new trial.  He argues that: (1) the trial court abused its discretion by denying him the opportunity to cross-examine police officers concerning their investigation of other suspects; (2) the trial court abused its discretion by excluding suspect lists prepared by the police as evidence; (3) the trial court abused its discretion by limiting defendant's cross-examination of police officers relating to their knowledge of people making false confessions; (4) the trial court abused its discretion by admitting prejudicial photographs of defendant; (5) the trial court abused its discretion by admitting an inflammatory photograph of Girl X; and (6) the trial court abused its discretion by refusing to admit certain written records, 
i.e
., medical records, prior witness statements of the victim and a forensic report.  Defendant contends that these errors either alone or in combination warrant a new trial.

The admissibility of evidence at trial is a matter within the sound discretion of the trial court, and its ruling may not be reversed absent a clear abuse of discretion.  
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).  

A.  
Police investigation of other suspects and knowledge of false confessions

Defendant first argues that he was denied the opportunity to cross-examine police officers concerning their investigation of other suspects which was a denial of a "full and vigorous defense on the merits."  Specifically, he contends that he was not allowed to question police about their investigation of James Alexander, who was known throughout the building as the "raper man," and Leon Maddux, who had previously been listed as the offender in a police report concerning a sexual assault on Girl X's cousin two years earlier.  Defendant also argues that his cross-examination of police officers was erroneously limited with respect to their knowledge of other people who confess to crimes they do not commit.  

The United States Supreme Court has held that " 'a primary interest secured by [the confrontation clause] is the right of cross-examination.' [Citation.]"  
Ohio v. Roberts
, 448 U.S. 56, 63, 65 L. Ed. 2d 597, 606, 100 S. Ct. 2531, 2537 (1980).  When determining whether a denial of cross-examination violates the defendant's right of confrontation, we should look not to what defendant has been prohibited from doing, but to what he has been allowed to do.  
People v. Hines
, 94 Ill. App. 3d 1041, 1048 (1981).  The issue under the confrontation clause is whether the jury has been made aware of adequate factors to determine whether the witness is worthy of belief, not whether any particular limitation has been placed on defendant's ability to cross-examine a witness or whether the jury has knowledge of any specific fact.  
Hines
, 94 Ill. App. 3d at 1048.  If the entire record shows that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry.  
People v. Wilson
, 254 Ill. App. 3d 1020, 1045 (1993).

It is true that an accused may attempt to prove that someone else committed the crime with which he is charged, but that right is not without limitations.  
Wilson
, 254 Ill. App. 3d at 1046.  The test of whether offered evidence will be admitted or excluded depends upon whether it is relevant.  
Wilson
, 254 Ill. App. 3d at 1046. 

Here, the line of questioning prohibited by the trial court did not relate to impeachment of the witness but instead related to information gleaned through police interviews with other suspects prior to defendant's arrest.  A review of the record shows that the State's evidence established that the police had initially compiled a list of 37 suspects and that defendant's name  was not on that list.  It was, however, brought to the jury's attention that James Alexander was a suspect, that several pieces of the subsequently destroyed evidence had been linked to him, and that many others, including Leon Maddux, were considered suspects at one time.  The questions of why certain people were initially regarded as suspects had already been established by the State's evidence, and any further questioning on those subjects was irrelevant, as defendant offered no substantive evidence that anyone else was responsible for the offenses for which he was on trial.  Nor did defendant call any of those individuals who had been investigated by police as witnesses to testify on his behalf.  We find that the trial court did not abuse its discretion in restricting defendant's cross-examination of police officers relating to their investigation of other suspects.

Likewise, we conclude that the trial court did not abuse its discretion in limiting defendant's questions concerning police officers' knowledge of other people making false confessions.  A court may reject offered evidence on grounds of irrelevancy if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature.  
Wilson
, 254 Ill. App. 3d at 1046.  The information sought by defendant -- since other people may have falsely confessed in the past to other crimes,  maybe defendant did also–  was wholly irrelevant and would have constituted inadmissible hearsay and have no probative value.  The trial court properly excluded this evidence.

B.  
Exclusion of police suspect lists from evidence
        

Defendant's next contention of evidentiary error is that the trial court abused its discretion by excluding the police suspect lists prepared in connection with their investigation of the Girl X attack.  As mentioned previously, the police had initially compiled a list of 37 suspects in connection with the case, and defendant was not on any of the lists.  He concedes that he was allowed to cross-examine officers about the existence of the list and its contents and that his name did not appear on that list, but he argues that he was improperly prohibited from offering the actual lists into evidence.  The trial court excluded the actual lists as irrelevant.

Generally, the test for admissibility of evidence is whether such evidence tends to prove the particular offense charged.  
People v. Lewis
, 165 Ill. 2d 305, 341 (1995).  Whether what is offered as evidence will be admitted or excluded depends on whether it tends to make the question of guilt more or less probable.  
Lewis
, 165 Ill. 2d at 341-42.  

Here, the admission of the actual suspect list would not have made the question of guilt more or less probable given that defendant had already been allowed to cross-examine the officers in detail about the contents of the lists.  The admission of the list would have been at best cumulative evidence.  The trial court did not abuse its discretion in excluding the list from evidence.

C.  
Admission of inflammatory photographs of defendant and the victim

Defendant next argues that the trial court abused its discretion by admitting a prejudicial

photograph of him, taken at the police station with his pants down exposing his genitalia and smoking a cigarette.  He also argues that the admission of an inflammatory photograph of the victim, taken while she was in the hospital with tubes protruding from her vagina and anus, was prejudicial error.  Defendant contends that the photograph of him had no probative value and was prejudicial, and that the photograph of the victim was inflammatory and likewise prejudicial.

Ordinarily, it is within the discretion of the trial court whether or not to admit a photograph into evidence.  
People v. Gibson
, 205 Ill. App. 3d 361, 369 (1990).  The court's decision must be based on a consideration of the photograph's probative value as opposed to its prejudicial effect, and a determination of whether it portrays facts relevant to an issue, and can be verified as a correct representation of those facts.  
Gibson
, 205 Ill. App. 3d at 369.  On appeal, its decision will not be reversed absent a showing of an abuse of discretion and of resulting prejudice to the defendant.  
Gibson
, 205 Ill. App. 3d at 369.

Here, the State was allowed to publish the photograph of defendant showing him with his pants down, his genitalia exposed and smoking a cigarette to show that he smoked during his interrogation and had shaved his pubic area prior to his arrest in April1997.  We agree with defendant's contention that the photograph was inflammatory and had no probative value whatsoever  inasmuch as he admitted to smoking during his interrogation and shaving his pubic area prior to his arrest.    We conclude, therefore, that the trial court abused its discretion in admitting the photographs as evidence.   However, because the evidence was not closely balanced , any error in admitting and publishing the photograph was harmless.

The State was also allowed to publish a photograph of Girl X taken while she was in the hospital which showed the gang signs written on her body as well as tubes protruding from her vagina and anus.  A defense request to have a cropped photograph used was denied by the trial court, which ruled that the probative value of the photograph outweighed any prejudicial effect.  It is within the discretion of the trial court to allow the jury to view photographs of a victim's injuries, and the decision will not be reversed absent an abuse of discretion.  
Trent
, 315 Ill. App. 3d at 450.  Where photographs are relevant to establish any fact in issue, they are admissible in spite of the fact that they may be of a gruesome nature.  
People v. Landry
, 54 Ill. App. 3d 159, 161 (1977). 

Here, we conclude that the trial court did not abuse its discretion in admitting the relevant, though gruesome, photograph of the victim to establish the existence of the markings written on her body.  The offenses perpetrated against the victim were gruesome in nature, and the jury was already aware of the nature of the crime.   Furthermore, the jury viewed the victim when she testified at trial with her extensive disabilities caused by the brutal attack upon her.

D.  
Exclusion of written records as evidence

Defendant's final contention of evidentiary error is that the trial court abused its discretion

by refusing to admit certain written records in three categories: medical reports of the victim, prior inconsistent witness statements of the victim, and a forensic report.  

He first argues that the trial court erred by excluding the medical reports of Dr. Carolyn Reeder and Dr. Lisa Thornton, the victim's treating psychologist and physician, which detailed the victim's ability to recall the attack upon her.  Defendant argues that these records were not hearsay, and that the exclusion of medical records under the business records exception to the hearsay rule did not apply because both the doctors testified at trial and laid the proper foundation for their admission into evidence.  He then makes the argument that the trial court erred in excluding them on the ground that they constituted inadmissible prior consistent statements because the entries were prepared during the regular course of the doctors' medical practices and were relevant work product.  Defendant also contends that the exclusion of a report prepared by Lori Smith which detailed prior inconsistent statements of the victim was error, as was the exclusion of a forensic report prepared by Devere Dewberry, a forensic scientist with the police department, which concluded that a number of hairs found on the victim were dissimilar to the hair of defendant.  

A well-established rule prohibits the use of a witness's prior consistent statement since it improperly bolsters the witness's in-court testimony.  
People v. Stout
, 110 Ill. App. 3d 830, 837 (1982).  In the absence of exceptions to the rule, to refute the contention of recent fabrication of the in-court testimony or a motive to testify falsely, bolstering a witness's testimony in this manner is reversible error.  
Stout
, 110 Ill. App. 3d at 837.  Moreover, pursuant to sections 115-5(c)(1) and (c)(2) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-5(c)(1), (c)(2) (West 2000)), any writing or record made by anyone in the regular course of any hospital or medical business or any writing or record made by anyone during an investigation of an alleged offense is excluded as evidence.

Here, each of the reports sought to be admitted into evidence by defendant was generated by either a doctor as part of her routine medical work or in connection with the investigation of an alleged offense and was clearly inadmissible under the Code.  725 ILCS 5/115-5(c)(1), (c)(2) (West 2000).  Also, the content of each report was fully testified to by the respective authors at trial without objection.  Thus, the admission of the reports themselves would have constituted inadmissible prior consistent statements of those witnesses and would have been merely cumulative of the witnesses' trial testimony.  Accordingly, we find that the trial court did not abuse its discretion by excluding the reports. 

Reasonable Doubt

Finally, defendant contends that he was not proven guilty beyond a reasonable doubt.  He

argues that there was no physical evidence linking him to the crime and that the State's entire case against him consisted of two confessions that were "internally inconsistent" with each other and obtained under extraordinarily suspect conditions and the eyewitness testimony of a victim who could not speak and, therefore, could not effectively be cross-examined by defense counsel.  

The standard of review on a challenge to the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  
People v. Lofton
, 303 Ill. App. 3d 501, 505 (1999).  When presented with such a challenge, it this court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury saw and heard the witnesses.  
People v. Young
, 128 Ill. 2d 1, 48 (1989).  It is not the function of this court to retry defendant (
People v. Scott
, 318 Ill. App. 3d 46, 53 (2000)), or to substitute our judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses (
Lofton
, 303 Ill. App. 3d at 505).  

Defendant was convicted of four counts of predatory criminal sexual assault of a child, attempted first degree murder and aggravated kidnaping.  A person commits predatory criminal sexual assault of a child if the accused is at least 17 years of age and committed an act of sexual penetration with a victim under 13 years of age.  720 ILCS 5/12-14.1(a)(1) (West 2000).  To prove the defendant guilty of attempt, the State was required to establish beyond a reasonable doubt that the defendant intended to commit the offense and that he took a substantial step towards the commission of the offense.  720 ILCS 5/8-4(a) (West 2000); 
People v. Smith
, 148 Ill. 2d 454, 458 (1992).  The elements of first degree murder are: (1) the killing of another without legal justification; (2) with the intent to kill or do great bodily harm to another or knowledge that such acts will cause death or knowledge that such acts create a strong probability of death or great bodily harm.  720 ILCS 5/9-1 (West 2000).  A kidnapper commits the offense of aggravated kidnapping when he inflicts great bodily harm or commits another felony upon his victim in the course of the kidnapping.  720 ILCS 5/10-2 (West 2000); 
People v. Quintana
, 332 Ill. App. 3d 96, 104 (2002).

Viewing the evidence in the light most favorable to the State, we find that the evidence was sufficient to support defendant's convictions.  The evidence presented at trial, including defendant's own statements and the victim's testimony, established that Girl X had been sexually assaulted, strangled, and poisoned with roach spray on January 9, 1997, by defendant.  The evidence also established that the attack occurred in the apartment where defendant resided with his then girlfriend as the victim was on her way home from an overnight visit with a friend.  At the time of the attack, the victim was 9 years old, and defendant was 26.  Defendant claims that no physical evidence linked him to the scene; however, it was he who identified the contents of the victim's stomach as TAT roach spray during his confession, which was found both in the apartment where defendant lived at the time of the attack and in apartment 205, which is where one of defendant's statements indicated that he threw the can after the assault.  Prior to his confession, the police were unable to determine the nature of the contents of the substance in Girl X's stomach, other than it was a petroleum distillate.  After the confession when the police located the can where defendant told them it would be, the contents matched the substance that Girl X had been forced to ingest.   Moreover, the jury was instructed on the lack of physical evidence and that it could make a negative inference towards the State due to that lack of physical evidence.  Defendant also refers to the "poor" quality of the  victim's testimony as rising to the level of reasonable doubt.  The trial court concluded, and we agree, that the victim was competent to testify, and the jury was in the best position to observe her demeanor and ability to communicate as she testified and to weigh the evidence, which was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt.  See 
Lofton
, 303 Ill. App. 3d at 505.  We find, therefore, that the evidence was sufficient to establish defendant's convictions beyond a reasonable doubt.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed. 

Affirmed.

WOLFSON and HALL, JJ., concur.

FOOTNOTES
1: 
One factor in a finding of insufficient DNA is degradation because DNA breaks down in the presence of sunlight, heat or chemicals.

2: 
The police had hair standards from Girl X, defendant, Tina Stokes and James Alexander.

3: 
In cases other than those without a statute of limitations, evidence is automatically disposed of after three years.