2022 IL App (1st) 192216-U

THIRD DIVISION
June 29, 2022

No. 1-19-2216

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|    Plaintiff-Appellee, | ) | Circuit Court of |
|  | ) | Cook County |
|  | ) |  |
| v. | ) | No. 14-CR-13185 |
|  | ) |  |
| WILLIAM PASCHAL, JR., | ) | Honorable |
|    Defendant-Appellant. | ) | Thaddeus L. Wilson, |
|  | ) | Judge Presiding. |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirmed. Evidence was sufficient to prove that defendant was robber and was accountable for actions of co-offender who shot and killed robbery victim. Trial court properly denied defendant's motions to suppress various pieces of evidence and correctly allowed witness's prior inconsistent statement into evidence. Trial court properly considered evidence at sentencing. Defendant's sentence is not excessive.

¶ 2     A couple of days each week, Dominique Baker and her cousin, Kevin Baker, would meet up after their college classes in downtown Chicago and go home to Englewood together, where they lived with Kevin's mother. On January 16, 2014, they got off a bus near 62nd and Western and began to walk the last leg home.

¶ 3     But Kevin would not make it home. Shortly after the Bakers got off the bus, defendant

came up to them, brandished a gun, and demanded their cell phones. After both Dominique and Kevin gave him their phones, he told them to "get the f*** out of here." Dominique and Kevin began to walk away.

¶ 4    That was not the end, however. As she and her cousin moved off, Dominique noticed another man with dreadlocks standing near the defendant, next to a maroon minivan. The Bakers kept walking, but the man with dreadlocks yelled out "what is you?" at them. Kevin and Dominique turned around to see the defendant walking away, but still facing them with his gun pointed in their direction. The other man had a gun up as well. Kevin, perplexed by the question, asked, "Huh?" The dreadlocked-man then shot the 19-year-old Kevin in the head, leaving him dead on the street while he and the defendant fled together in the maroon van.

¶ 5    The investigation eventually led police to the defendant, and a jury convicted him of first-degree murder and armed robbery. After multiple sentencing hearings, the court ordered him to serve a total of 80 years in prison.

¶ 6    Before us, defendant launches multiple claims challenging his conviction and sentence. We cannot agree with any of them. The evidence was sufficient to convict him, the police committed no misconduct in its investigation, and we cannot say the court made any errors in admitting various evidence during trial, particularly those items of evidence that defendant has not made part of the record on appeal. Finally, his sentence is proper, and we reject any constitutional challenge to it at this stage. We thus affirm.

¶ 7                                    BACKGROUND

¶ 8    Because defendant challenges the sufficiency of the evidence, we will discuss the facts in depth. Unless noted otherwise, the following facts were adduced at defendant's trial.

¶ 9        In January 2014, Dominique Baker lived with her aunt, Nina, and her cousin, Kevin,

in the Englewood neighborhood of Chicago. Kevin and Dominique both attended college in the Loop and would go home together several times a week. On the afternoon of January 16, Dominique wrapped up working at her internship, then met up with Kevin. They hopped on an Orange Line train, got off at 47th and Western, then took the Western bus to 62nd street and Western, approximately three blocks from their home. It was approximately 4:00 to 4:15 in the afternoon when they got off the bus.

¶ 10     Dominique and Kevin began to walk west toward 62nd and Maplewood, where Nina's house was. As they crossed the intersection of 62nd and Campbell, Dominique noticed a maroon van parked on the corner. Two men were standing there; Dominique later identified one of the men as the defendant. When the Bakers had passed the men at the van and were crossing the street, the defendant came up from behind them. At the time, Kevin was to Dominique's left, and the defendant was to Kevin's left. When the defendant was about four feet away, he pulled out a black handgun and told the Bakers to turn over their phones. Dominique could see the defendant's face clearly and looked at him in the eye during the robbery. The Bakers gave their phones to the defendant, and he told them to "get the f*** outta here."

¶ 11     Dominique and Kevin began to walk away. About this time, Dominique noticed the other man at the van, whom she described as an African American man with dreadlocks with blond tips. Although he was farther away from the Bakers than the defendant was, this man, too, had a gun, Dominique said, and pointed it at them. Dominique said she "kept an eye" on the men while they were walking away and could see both men were on the move.

¶ 12     While the defendant was stepping away, the man with the dreadlocks yelled out "what is you?" to the Bakers—ostensibly inquiring any gang affiliation Kevin might have. Although defendant was moving away from them, he still had his gun trained on Kevin and

Dominique. The man with dreadlocks also had his gun up. Kevin responded "huh?" to the query, and Dominique heard two gunshots. Kevin fell to the ground, and the defendant and the man with dreadlocks ran back to the maroon van and sped off.

¶ 13    Dominique screamed. At some point, she called her aunt Nina, who rushed to the intersection of 62nd and Campbell, where she saw her son lying in the street, bleeding from the head. An autopsy later determined that Kevin had been shot multiple times and died of a gunshot wound to the head.

¶ 14    At about the same time, Dushune Burton was out walking his dog nearby. Burton lived near 62nd and Campbell in Chicago and decided to take his pet through the alleyway. When he came to the mouth of the alley, he saw a young man and woman walking west together on 62nd Street toward Campbell. Farther down the street, he saw what he thought was a maroon Astro Van. Burton could not see anyone inside the vehicle, which was about 50 feet away.

¶ 15    While he stood with his dog, Burton saw two men get out of the van, run across the street, and rob the young man and woman. The men then ran to get back into the car, but before they did, they "let out shots." Burton could not see the men's faces, but he noticed that one of them appeared to have braids. After the shots rang out, the men ran back to the maroon van, got in, and sped away. Burton walked toward the man and woman and saw the man lying on the street. He appeared dead, and Burton called the police. The entire incident took between 30 seconds and two minutes.

¶ 16    Dominique spoke to police after the shooting and provided them with a description of both the robber and shooter. She described one as being approximately 5-feet, 7-inches tall, wearing a skull cap, and with a gap in his front teeth. She said the other was approximately the same height, but with a slightly lighter skin complexion and dreadlocks with blond tips.

¶ 17    That same day, Kiwane Williams was at home with his mother. Sometime between 5 and 6 p.m., he left to drive his girlfriend to class at Malcolm X College. Around that time, Williams spoke on the phone with defendant, whom he had known all his life, who told him he wanted Kiwane to drive him to a store so he could sell a phone. Defendant eventually came to Williams, and together with a man named Demarcus, whom Williams knew as "Little Marky," the men and Williams's girlfriend hopped into his car.

¶ 18    After Williams dropped his girlfriend at class, he and defendant drove to a store at 63rd and Racine. Williams took a gold iPhone (or an iPhone in a gold case; Williams's memory was not consistent at trial) from defendant and sold it at the store for $200. Williams kept $50 for himself and gave defendant the rest of the money. After going to a local mall, Williams took defendant back to his house.

¶ 19    Back at the scene of Kevin's murder, police began investigating the case. They first spoke with a confidential informant, then later a man named Antonio Johnson. (Neither the informant nor Johnson testified at trial.) Based mostly on Johnson's tip that defendant was involved in the murder, the police assembled a couple of five-picture photo arrays to show to Dominique. On January 18, two days after the shooting, police showed Dominique the first array, one photo at a time. Upon seeing defendant's picture, she said he looked like the robber, but that she wanted to see him in person to be sure. When police showed her another photo array, Dominique did not see anyone she recognized.

¶ 20    In February 2014, Sharonda Bays needed a new phone. So the 16-year-old Chicagoan went to a store on 63rd and Racine, where she had previously bought a skateboard. There, she found an iPhone 5 and paid $400 for it, believing it was brand new. However, when she turned the phone on at home to set it up, she found it already had contacts and text messages on it.

Despite that, Bays decided to keep the phone and use it. Police would later reach out to her in June and take the phone from her; it was the last time she saw it until defendant's trial.

¶ 21    Police arrested defendant in February 2014 and placed him in a lineup with four others for Dominique to view. She immediately identified defendant as the robber, saying she was 100 percent certain he had taken their phones the night Kevin was killed. Although Dominique told some of the police officers the robber had a gap tooth, when she viewed him in the lineup, she realized defendant had an overbite with no gap between his front teeth. Despite this, Dominique said she knew there was "something significant" about the robber's teeth.

¶ 22    That same day, detectives interviewed defendant and asked him what he was doing on January 14. He told them that around 3 p.m., he hung out with Demarcus Boswell and Williams, driving around in Williams's car. The three men drove around all day, defendant told police. The defendant never brought up a cell phone, nor did he say he was involved in the robbery or shooting. Police tried to locate Williams, but he was not in Illinois at the time. Investigators released defendant without charging him.

¶ 23    About a month later, police arrested Williams on another matter. The detectives investigating Baker's murder interviewed him, and he told them about the cell phone that the defendant asked him to sell. Williams subsequently spoke to an assistant state's attorney (ASA), who took down a handwritten statement that Williams signed. (At trial, the State called the ASA who took the statement and admitted the statement into evidence over the defendant's objection; we will discuss this in more detail later.) About this time, police tracked down Dominique's phone to Bays, and they took it from her.

¶ 24    Later, in June 2014, police showed Dominique an iPhone. Although the information on the phone wasn't hers, she was able to match the serial and IMEI numbers on the phone's

settings screen to the box the phone came in when Dominique bought it. (An IMEI number is a unique identification number for a mobile phone; no two phones have the same IMEI number.) On June 29, 2014, police arrested defendant again, and the State charged him with separate counts of intentional first-degree murder, substantial-risk murder, felony murder, and several counts of armed robbery with a firearm.

¶ 25                                   I. Pretrial Motions

¶ 26        Before trial, defendant challenged his February arrest and the lineup he was placed in after it. At that hearing, Detective Kristi Battalini detailed how the investigation led to defendant. Police arrested Antonio Johnson two days after the murder, on January 18, 2014, on an unrelated matter. Johnson told police that a woman named Brianna told him that a shooting near 62nd and Campbell was a gang-related retaliation for the earlier murder of a man named Joseph Britman. Johnson said three men were involved: "Pookah," "Little Markie," and "Little Vino."

¶ 27        Police were able to determine that defendant was "Little Vino." With this information, police showed Dominique the photo array, where she first identified defendant as the person who robbed her. After that, police were able to track down the owner of the maroon van and the van itself; it was parked near the home of "Pookah" (whose real name was Kevin Porter) on the south side of Chicago. When they took Dominique to look at the van and see if she recognized it, she told them it was the same van the men used the night of the murder. The court found police had probable cause when they arrested the defendant and denied his motion.

¶ 28        Defendant also challenged the identifications themselves, arguing police used suggestive tactics and highlighted him, both in the photo array and lineup. After viewing the photo array and a picture of the lineup, the court denied this motion, too.

¶ 29        The defendant also moved for discovery sanctions against the State for the loss of a

surveillance camera video. At a hearing, the defendant proffered the following information: police had viewed a surveillance video that showed part of 62nd and Campbell the night of the murder. On that video, the maroon van that the assailants used could be seen. Police were able to recover a screenshot of the video, but not the video itself. The defendant argued the whole video might have had relevant information, but admitted he had no evidence the police purposely lost the video or otherwise acted in bad faith. The court declined to sanction the State for the destruction of the video, which it believed was inadvertent.

¶ 30                                    II. Trial and Verdict

¶ 31       The court held a jury trial over multiple days. The State argued that defendant was accountable for his accomplice's acts and thus was guilty of intentional murder. Alternatively, the State argued that the murder occurred as a result of the armed robbery, making him guilty of felony murder. In closing arguments, the State told the jury that it did not matter which type of murder the defendant committed, only that they proved he was either accountable for his accomplice or that the murder happened during the course of the armed robbery.

¶ 32       After approximately two days of deliberations, the jury found defendant guilty of first-degree murder and armed robbery with a firearm for robbing both Kevin and Dominique. It also found that defendant was armed with a firearm when he committed first-degree murder. The jury returned a general verdict for the first-degree murder charges that did not ask the jurors to specify which type of murder defendant committed. Accordingly, the court entered verdicts of guilty on three counts of first-degree murder (intentional, strong probability of death, and felony murder) as well as the armed robbery counts.

¶ 33                                    III. Post-Trial and Sentencing

¶ 34       The court denied defendant's motion for a new trial. At defendant's sentencing

hearing, the State offered evidence that the defendant had committed several offenses while in custody, including possessing a shank weapon and stealing a handcuff key. The State also entered defendant's jail disciplinary record into evidence, which showed he had 34 separate incidents while in pretrial custody. The court also heard victim impact statements from Dominique and Nina Baker. During argument, the State also asked the court to find that the defendant (or someone he was accountable for) caused great bodily harm, which would reduce the amount of sentencing credit the defendant could receive for the armed robbery.

¶ 35     Defendant offered extensive mitigation evidence, including school and hospital records. The evidence showed that defendant was a troubled, parentless 18-year-old who suffered from severe psychiatric problems most of his life. His mother gave birth to him in a toilet and was incapable of raising him, and his grandmother had to take custody when he was only 10 years old. About that time, he began to harm himself regularly, cutting his body. He tried at various times to hang and drown himself, both in and out of custody. He even tried to hang himself while in jail at one point, then tried to drown himself in a toilet on another occasion.

¶ 36     In determining the appropriate sentence, the court first found that the conduct leading to the murder resulted in great bodily harm to any victim—specifically the death of Kevin—meaning the defendant would have to serve 85 percent of his armed robbery sentence. The court then merged the multiple murder convictions into the most serious count—count I, intentional murder—and merged the two armed robbery convictions into one. For the murder, the court sentenced defendant to serve 45 years in custody, plus 15 years with the firearm enhancement, for a sum of 60 years. On the armed robbery, the court sentenced defendant to an aggregate of 35 years—20 for the armed robbery plus 15 for the firearm enhancement. By law, the sentences on the murder and armed robbery had to be served consecutively, for a total 95 years in prison.

¶ 37        Defendant moved to reduce his sentence, claiming among other things that it was excessive. At the hearing, defendant's grandmother, Antoinette Rodgers, detailed his troublesome upbringing. Rodgers told the court that defendant's life began when he was born into a toilet when his mother went into labor but refused to go to the hospital. His mother struggled with drug addiction so severely that she would often leave defendant with Rodgers for long periods of time, then sporadically come back and take him. When defendant was nine years old, Rodgers went to get him from Wisconsin because "his mother was out of control." Rodgers found him living in a house with many other people, with no clothes or other belongings.

¶ 38        After that, defendant began to live with Rodgers. She tried to get him psychiatric help because he was acting out at school and had been suspended ten times from the fourth grade. He struggled to read and was eventually diagnosed with attention deficit hyperactivity disorder (ADHD). Although he was given medications, they did little to help him, Rodgers said. Defendant eventually did get his high school degree while he was incarcerated, Rodgers said.

¶ 39        The court reduced defendant's sentence. The court noted that Rodgers's testimony weighed on it, and it believed that the defendant did struggle as a child, but that there was no evidence it limited him from learning the difference between wrong and right. Still, it saw fit to reduce the sentence on the murder to 30 years in prison, plus the 15-year firearm enhancement, totaling 45 years (15 years less than the original sentence). The court did not change the 35-year sentence for the armed robbery counts but ordered the sentences on those to be served concurrently (though they would run consecutively to the sentence for murder). Overall, the defendant was sentenced to 80 years in prison.

¶ 40                                    ANALYSIS

¶ 41        On appeal, defendant's challenges can be sorted into three general fields: 1) the

evidence was insufficient to convict him; 2) the court made various errors admitting pieces of evidence; and 3) his sentence was improperly imposed and is excessive. We address them in that order.

¶ 42                                    I. Sufficiency of Evidence

¶ 43                                    A. Armed Robbery Conviction

¶ 44        Defendant first challenges the sufficiency of the evidence that convicted him of armed robbery. Due process requires that a person may not be convicted of a criminal offense "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In our review of a conviction, we view the evidence in the light most favorable to the State and ask "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The *Jackson* standard applies in all criminal cases, regardless of the nature of the evidence. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

¶ 45        We do not retry the defendant on appeal. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The trier of fact determines the credibility of the witnesses, decides what weight to give their testimony, resolves conflicts in the evidence, and draws reasonable inferences from that evidence. *People v. Swenson*, 2020 IL 124688, ¶ 36. These credibility determinations are entitled to great weight. *Id.* When reviewing the evidence, we will draw all reasonable inferences in favor of a finding of guilt. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Still, the mere fact that a jury accepted witness testimony does not mean it was reasonable for it to do so; reasonable people will, on occasion, act unreasonably. *Id*

¶ 46        Turning to the evidence in this case, defendant first argues that the State did not prove

he was the one who robbed Kevin or Dominique. Specifically, he challenges Dominique's identification that he was the robber, since Dominique was the only person at trial who identified the defendant at the corner of 62nd and Campbell the night of January 14, 2014.

¶ 47    A conviction may rest on a positive identification by a single eyewitness who had ample opportunity to observe and perceive the defendant. *In re M.W.*, 232 Ill. 2d 408, 435 (2009). We evaluate a single-witness identification using the so-called *Biggers* factors, taken from *Neil v. Biggers*, 409 U.S. 188 (1972). *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 22. The factors are: (1) the witness's opportunity to view the offender at the time of the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any previous description of the offender by the witness, (4) the degree of certainty shown by the witness in identifying the defendant, and (5) the length of time between the offense and the identification. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. No single factor, by itself, conclusively establishes that an identification is reliable; instead, the trier of fact must consider all the factors. *Macklin*, 2019 IL App (1st) 161165, ¶ 22.

¶ 48    Defendant primarily focuses on the third factor, the accuracy of any previous description of the offender. After the robbery and murder, Dominique gave a description of the robber to police and said he had a gap between his front teeth. But the evidence at trial clearly established that the defendant does *not* have a gap in his teeth; rather, he has a pronounced overbite.

¶ 49    A point in defendant's favor, to be sure, but not the decisive blow he claims. An overbite is not a gap, but it is a distinguishing trait no less. And at trial, Dominique admitted she noticed something unique about the robber's teeth and mouth, so it is not as if Dominique missed this unique physical characteristic entirely. Yes, she got the detail wrong. But that alone is not

enough to reverse on appeal, and this is not a case where the only reasonable conclusion we can draw is contrary to the verdict. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 50    Particularly not when every other *Biggers* factor supports defendant's conviction. For example, when it comes to the first factor, the witness's opportunity to observe the defendant, Dominique had both ample time to see the defendant and was close enough to accurately perceive his face. In judging this factor, we consider the witness's proximity to defendant, the length of observation time, and the surrounding conditions. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 51    Dominique testified that it was approximately 4:15 in the afternoon when the robbery happened, and that the area was well lit. She saw defendant before the robbery, when he was standing across the street next to the maroon van. When defendant walked up to her and Kevin and demanded their phones, he was approximately four feet away. There was nothing covering his face, and Dominique could look him in the eye. Dominique had ample opportunity to view the defendant under favorable conditions. This factor favors the State.

¶ 52    The same can be said about the second factor, the degree of Dominique's attention at the time of the offense. Understandably, Dominique's attention was fixated on the man who was robbing her at gunpoint, and she said there was nobody else around other than defendant and his co-offender. She continued to watch him after he told both her and Kevin to leave, meaning her attention remained fixed on defendant during and after the robbery. And she saw him again, after the robbery, when she and Kevin turned around and faced both men, before defendant's accomplice shot and killed Kevin.

¶ 53    The fourth factor, the degree of Dominique's certainty when she identified the defendant, also tips toward the State. When police showed Dominique a photo array, she

identified defendant as the robber, but said she would need to see him in person to be sure. While the defendant believes this comment shows hesitation and doubt, we see it differently. Particularly because when Dominique *did* see the defendant in person at the lineup, she was sure he was the robber. Whatever hesitation she had upon seeing the photo array—if there was any at all—was alleviated when she viewed the lineup.

¶ 54       Last, there was a short period of time between the incident and when Dominique viewed the photo array and lineup. Two days after the offense, Dominique saw the photo array and identified defendant as the robber. A month after that, she viewed the lineup and again identified defendant. The short time here meant that the face she saw was fresh in her mind when she viewed the photo array and lineup.

¶ 55       The defendant takes pains to point out what he thinks are inconsistencies with Dominique's testimony and all the reasons why she was unbelievable. This is simply a general attack on Dominique's credibility. The jury heard the impeachment of Dominique's testimony and believed her, anyway. Minor inconsistencies in a witness's testimony may affect the weight of that evidence, but it does not automatically create a reasonable doubt of the defendant's guilt. *People v. Adams*, 109 Ill. 2d 102, 115 (1985). The jurors here believed the State's witnesses, and they are in a superior position to determine who was credible; we will not intrude on their province without good reason. *Cunningham*, 212 Ill. 2d at 283-84.

¶ 56       Then there is the stolen phone itself. Recall that Kiwane Williams testified that he took the defendant to a store the same day as the robbery, where he sold a phone that the defendant gave him. Sharonda Bays later bought a phone from that store, and police were able to recover it. Dominique said it looked like the phone the robber took from her, and the serial and IMEI numbers on it matched the box the phone came in when she bought it. So while Williams

did not see from where the defendant got this phone, it is reasonable to infer that this defendant had this particular phone because he had just taken it from Dominique. In other words, the State not only had Dominique's positive identification—it also placed the spoils of the crime in defendant's hand through Williams and Bays.

¶ 57     All in all, the evidence amply supports the conclusion that the defendant robbed the Bakers. We affirm defendant' armed robbery conviction.

¶ 58                     B. Murder Conviction

¶ 59     Defendant next claims that he was not proven guilty of murder beyond a reasonable doubt. Defendant obviously did not personally shoot and kill Kevin. But he says the evidence was insufficient to convict him of Kevin's murder based on an accountability theory, as, in his words, "the armed robbery and the murder were committed by two different people with two different designs at two distinct times." Likewise, he claims, he was not guilty of felony murder because the murder was not the proximate cause of the robbery.

¶ 60     We start with accountability, which in of itself is not a crime. *People v. Shaw*, 186 Ill. 2d 301, 325 (1998). Instead, accountability is a mechanism through which the State may obtain a criminal conviction of a defendant based on the acts of his accomplice. *People v. Hicks*, 181 Ill. 2d 541, 546 (1998). A defendant may be accountable for acts performed by another if the defendant shares the criminal intent of the principal, or there was a common criminal plan or purpose. *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995). Words of agreement are not necessary to establish a common criminal design or purpose; the circumstances surrounding the unlawful conduct can give rise to an inference that a common criminal design existed. *Id.* A person need not actively contribute to the principal's criminal behavior to be accountable for it, since an accomplice may aid and abet without participating in the overt act. *People v. Batchelor*, 171 Ill.

2d 367, 376 (1996).

¶ 61     Would-be robbers can become convicted murderers when one of their cohorts kills another person during the robbery. See, *e.g.*, *People v. Montes*, 192 Ill. App. 3d 874 (1989) (defendant accountable for murder when he agreed to act as lookout for robbery); *People v. Johnson*, 55 Ill. 2d 62, 67 (1973) ("Where murder is committed during a robbery, all participants in the robbery are deemed equally guilty of murder and it is immaterial who fired the fatal shot.") (internal quotations marks omitted)).

¶ 62     Defendant tries to distance himself from these cases, arguing that this is not a case of a robbery escalating to murder—it is a mere robbery, then a separate murder. He was "out of the picture" when the shooter approached Kevin and "began his own agenda." He points out that after he took the Bakers' phones, he told them to "get the f*** out of here." The Bakers and defendant then began to walk away from each other. At this point, he says, the robbery was completed and finished. See, *e.g.*, *People v. Dennis*, 181 Ill. 2d 87, 103 ("[T]he offense of armed robbery is complete when force or threat of force causes the victim to part with possession or custody of property against his will.") Thus, says defendant, whatever criminal activity defendant may have committed was completed before the shooter intervened and committed the "separate" act of shooting.

¶ 63     But the jury could have reasonably found that defendant attached himself to a group bent on illegal acts—beginning with the defendant's own crime—such that defendant shared a common purpose with the shooter. See *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 64     For one, defendant and the shooter arrived and left together in the same vehicle. The jury could have concluded that they were scheming together to commit, at a minimum, an armed robbery. It is not as if the shooter were some stranger who showed up out of the blue and started

opening fire on Kevin. They arrived together, committed crimes together, and escaped together.

¶ 65    Defendant would deny any involvement in the shooting, but consider that, when the shooter first approached Kevin, asking him about his gang affiliation, defendant's gun remained trained on the Bakers, even though defendant was walking away from them. Defendant may not have pulled the trigger, but he is hard-pressed to distance himself from the shooter's actions when defendant *helped* the shooter by holding the Bakers in place with a pointed gun. See, *e.g.*, *People v. Kessler*, 57 Ill. 2d 493, 497 (1974) ("conduct" in accountability statute encompasses any criminal act done in furtherance of planned and intended act).

¶ 66    Here, even if defendant did not know in advance that his accomplice would shoot Kevin, and even if he did not want it to happen, defendant was part and parcel of the criminal scheme from start to finish. Defendant got the ball rolling when he confronted the Bakers and robbed them at gunpoint. When the shooter confronted Kevin about which gang he belonged to, defendant helped by keeping his gun pointed squarely at Kevin and Dominique. It is reasonable to infer that the defendant intended to aid the shooter. Since he intended to aid in the commission of an offense, he is accountable for his partner's crime. *See Shaw*, 186 Ill. 2d at 322.

¶ 67    As the evidence was sufficient to convict the defendant of intentional murder by accountability, we need not address his claim that he was not guilty of felony murder. The jury returned a valid general verdict of guilty on intentional murder, and thus the validity of the other murder counts—which merged into the intentional-murder count—are of no consequence. *See People v. Perry*, 2011 Ill App (1st) 081228, ¶ 56 (under one-good-count rule, general finding of guilt may be affirmed when proof is sufficient on one good count in indictment.)

¶ 68                        II. Challenges to Admission of Evidence

¶ 69    Finding the evidence sufficient to support the convictions for armed robbery and

intentional murder, we turn to the evidence that secured it. Defendant raises four attacks: 1) the police lacked probable cause when they arrested him; 2) investigators used unduly suggestive tactics in both the photo array and lineup, making defendant stand out and thus easier for Dominique to identify; 3) the State improperly bolstered the testimony of one of its witnesses at trial; and 4) the court should have sanctioned the State for the inadvertent destruction of a surveillance video. We address each issue in turn.

¶ 70                                      A. Probable Cause to Arrest

¶ 71        The fourth amendment of the United States Constitution (U.S. Const., amend. IV) and its counterpart in the Illinois Constitution (Ill. Const. 1970, art. 1, §6) guarantee an individual's right to be free from unreasonable searches and seizures. The touchstone of the protection is the "reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *People v. Timmsen*, 2016 IL 118181, ¶ 9.

¶ 72        Police arrested the defendant without first securing a warrant. A warrantless arrest is reasonable only if it is supported by probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *Id.* When determining if officers had probable cause, we look at the totality of the circumstances that existed at the time of the arrest. *Id.*

¶ 73        We apply a bifurcated standard of review when examining a trial court's ruling on a motion to quash arrest and suppress evidence. *People v. Carter*, 2021 IL 125954, ¶ 21. We afford the trial court's findings of fact great deference and will reverse those findings only if they are against the manifest weight of the evidence. *Id.* But we review the ultimate legal ruling of whether the evidence should be suppressed *de novo*. *Id.*

¶ 74    At a pretrial hearing, Detective Kristi Battalini detailed how police zeroed in on defendant. Although he was not on the radar at the onset of the investigation, defendant's name came into the picture after police arrested Antonio Johnson on an unrelated weapons charge. Johnson, ostensibly hoping to curry favor with police and prosecutors, told police he had heard about the shooting. He said that a woman named Brianna told him that three men were involved: "Pookah," who police determined was Kevin Porter; "Little Markie" or "Marky," who was Demarcus Boswell, and "Little Vino," who was defendant. Johnson also said that the shooting was in retaliation for the killing of Joseph Britman, a gang member who had been shot the week before.

¶ 75    The defendant insinuates that, without any information about who Brianna was or where she got this information, Johnson's statements could not be the underpinning of probable cause to arrest him. But if police can corroborate an informant's information, they may be able to develop probable cause to arrest a suspect. *See People v. Tisler*, 103 Ill. 2d 226, 252-53 (1984). And that's what investigators here set out to do. With defendant's name now in their hands, they put together a photo array with his photo and showed it to Dominique. When she saw the defendant's picture, she said he was the robber, but also said she would have to see him in person to be sure.

¶ 76    The investigators did not stop there. They checked vehicle records and learned that Porter, a.k.a. "Pookah," owned a red or burgundy 2000 Ford Windstar. They tracked down the van, which was parked on the street, and showed it to Dominique. She said it was the car the shooter and robber were standing by before and after the shooting. Police were also able to confirm that Britman had been killed approximately a week before Kevin Baker was, and that Porter and the defendant knew each other.

¶ 77     In a subsequent interview (and after defendant's arrest), Johnson's story changed slightly; he later admitted he lied when he said Brianna told him about the shooting. Instead, he said he heard about it at a funeral. From this, defendant again claims that Johnson was wholly unbelievable. But he misses the point; police did not need to investigate the source of Johnson's information, only the information itself. *Tisler*, 103 Ill. 2d at 253. Johnson may have changed *who* told him what happened, but it did not change the *substance* of what he knew.

¶ 78     More importantly, police confirmed the most important parts of what Johnson told them with Dominique and good detective work. So the ultimate source of the information became less relevant. *See People v. Macias*, 39 Ill. 2d 208, 213 (1968). When a tip is proven accurate on some counts, the informant is more likely correct about other details. *Tisler*, 103 Ill. 2d at 238. And this was not a trial, requiring proof beyond a reasonable doubt; the police only needed evidence that suggested the defendant was probably connected to the crime. *See Grant*, 2013 IL 112734, ¶ 11 ("Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." (Internal quotation marks omitted.)).

¶ 79     The record thus indicates that the police did excellent work and did not rush to arrest defendant and waited for probable cause before doing so. When police finally detained the defendant, they had Johnson's statement implicating him in the murder, Dominique's identification of the defendant as the robber, and her confirming Porter's van was the one the defendant used before and after the shooting. Police corroborated Johnson's tip and, viewed in the totality of the circumstances here, established probable cause to arrest defendant.

¶ 80                         B. Photo Array and Lineup

¶ 81     Defendant challenges the photo array police assembled before his arrest and a lineup

they put together afterward. Dominique identified him in both, then identified him again at trial as the robber. Defendant claims that police used improper tactics to highlight him. He also complains that the trial court considered a "host of extrajudicial information" when it referenced various "best practices" about photo array and lineup procedures the court had learned about outside of what was presented at the hearing on defendant's challenge to the array and lineup.

¶ 82        The defendant has the burden of showing a pretrial investigation procedure was impermissibly suggestive before the burden shifts to the State to prove any subsequent identification by a witness was rooted in an independent basis. *People v. McTush*, 81 Ill. 2d 513, 520 (1980). Specifically, the defendant must prove that the identification procedure was so unnecessarily suggestive and conducive to irreparable misidentification that the defendant was denied due process of law. *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003).

¶ 83        When evaluating such a challenge, the court must look at the strength of the suggestion police make to the witness through a specific activity that places a spotlight on an individual. *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (2010). We will reverse a trial court's factual determination that the identification procedure was not unduly suggestive only if it is against the manifest weight of the evidence. *People v. Lawson*, 2015 IL App (1st) 120751, ¶ 39.

¶ 84        Neither the photo array nor the lineup that Dominique viewed has been made part of the record although it seems, based on our reading of the transcripts of the proceedings, the photo array and photos of the lineup were entered into evidence as physical exhibits. (It also appears they were impounded after trial, but nevertheless, they did not make it to us.) Thus, we do not know what Dominique or the trial court looked at.

¶ 85        As the appellant, the defendant has the burden to present a sufficiently complete record. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). To challenge a particular decision, the

record must be complete enough to permit appellate view of specific claims of error. *People v. Banks*, 378 Ill. App. 3d 856, 862 (2007). In the absence of such a record, we will presume the court heard sufficient evidence and argument to support its decision. *People v. Ramos*, 295 Ill. App. 3d 522, 525 (1998). Since the defendant has not provided us with the photo array or a photo of the lineup Dominique viewed, we presume that the trial court properly denied his motion because it did see what the photo array and lineup looked like.

¶ 86　　Despite not including the actual array or lineup, the defendant bases his entire argument on the trial court's comments about the lineup and photo arrays, even though the court found the array and lineup were admissible. For example, the trial court noted that the background of defendant's photo in the photo array was the only one with a blue background, and that two of the fillers in the lineup had a lighter complexion than the others. But the fillers in lineups and photo arrays do not need to be physically identical. *People v. Love*, 377 Ill. App. 3d 306, 311 (2007).

¶ 87　　Defendant also objects to some of the court's comments at the hearing. After hearing argument on the motion, the court noted that, in other hearings and at seminars, it was familiar with the "best practices" for showing a photo array or constructing a lineup. It suggested it was considering those practices in denying the motion. However, there was no testimony of what those "best practices" were in this case, and the defendant believes the court sought reasons beyond the evidence to deny his motion. But while it is possible that the court's reference to information beyond the evidence presented at a hearing could be an issue in a different case (*see e.g. People v. Yarbrough*, 93 Ill. 2d 421, 429 (1982)), the court's comments here were innocuous.

¶ 88　　In any event, the balance of the evidence supports the court's decision. Police showed

Dominique multiple photo arrays, and in at least one, she did not identify anyone. Police also showed her the photos in the arrays one at a time, instead of all at once, as is standard police procedure. Dominique testified at trial about the procedure and her identification of defendant as well, and we may consider the evidence at trial in addition to the evidence from the suppression hearing. *People v. Almond*, 2015 IL 113817, ¶ 55.

¶ 89　　　We are unable to conclude, on this limited record and in light of what we have said above, that Dominique's identifications of defendant in the photo array and in the lineup were based on any improperly suggestive tactics. The trial court's ruling was not against the manifest weight of the evidence.

¶ 90　　　　　　　　　C. Missing Video

¶ 91　　　Defendant's next challenge concerns a video—or rather, a missing one. During the investigation, police reviewed surveillance footage from a camera near the shooting. They also were able to recover a screenshot from one moment on the video. However, the video itself was somehow never recovered and later deleted or otherwise destroyed.

¶ 92　　　Before trial, defendant moved for discovery sanctions, such as dismissal of the indictment, barring testimony about the events the recording would have captured (*People v. Kladis*, 2011 IL 110920), or a special jury instruction that would allow the jurors to draw a negative inference against the State for destroying the evidence (*People v. Sykes*, 341 Ill. App. 3d 950, 970 (2003)). The court found the destruction was inadvertent and not attributable to the police or prosecution and declined to sanction the State. On appeal, defendant renews only his claim that the destruction of the video violated his right to due process.

¶ 93　　　Illinois Supreme Court Rule 412 (eff. Mar. 1, 2001) provides for the disclosure of materials and information within the state's possession. Rule 415(g) permits the court to sanction

a party that fails to comply with an applicable discovery rule. See Ill. S. Ct. R. 451(g) (eff. Oct. 1, 1971). The decision whether to sanction a party for a discovery violation is left to the discretion of the trial court. *People v. Koutsakis*, 255 Ill. App. 3d 306, 312 (1993).

¶ 94    Law enforcement's destruction of, or failure to preserve, "potentially useful evidence" does not violate due process if the defendant cannot demonstrate the officers acted in bad faith. *People v. Hobley*, 159 Ill. 2d 272, 307 (1994); see *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Bad faith implies a furtive design, dishonesty, or ill will. *People v. Danielly*, 274 Ill. App. 3d 358, 364 (1995).

¶ 95    But if the evidence that the State suppresses or fails to disclose constitutes "material exculpatory evidence," the good or bad faith of the prosecution is irrelevant; the failure to disclose it automatically violates due process. *Illinois v. Fisher*, 540 U.S. 544, 547 (2004); see *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Agurs*, 427 U.S. 97 (1976).

¶ 96    Defendant here believes that the lost evidence was material and exculpatory, and thus it matters not whether the police acted in good or bad faith—his due process rights were violated. But we have no basis to characterize this evidence as exculpatory. As the State notes, the video could have helped *or* hurt the defendant. It may have shown he was not the robber at all, or it might have shown he not only robbed the Bakers but also helped his cohort kill Kevin. There is no proof—or even a suggestion—that the video was "material exculpatory evidence."

¶ 97    As noted, on the other hand, if the State fails to preserve evidence that only *might* have exonerated the defendant, he must establish the police acted in bad faith to prove his due process rights were violated. *Youngblood*, 488 U.S. at 58. Without any indication the video was material exculpatory evidence, *Youngblood* dictates the outcome here.

¶ 98    Defendant suggests that since police were able to obtain a screenshot of the video, but

not the video itself, the video was "obviously in the possession of the police." But there is no evidence of this. And at the hearing on his motion, defendant himself admitted he had no idea how the video was destroyed. He never alleged—nor offered any proof—that police destroyed the video themselves or acted in bad faith while doing so. Without any evidence of bad faith, defendant cannot establish a due process violation.

¶ 99        We, like the trial court, are a little confused why police were able to save a screenshot of the video but not the video itself. Regardless, we have no basis for finding an abuse of discretion in the trial court's refusal to impose sanctions.

¶ 100                    D. Use of Kiwane Williams Statement

¶ 101       Recall that Kiwane Williams testified that defendant called him shortly after the robbery occurred. At defendant's request, Williams took him to a store at 63rd and Racine, where Williams sold a gold iPhone that the defendant had given him. Sharonda Bays later bought a used iPhone from that store, and police later connected the serial number on the phone Bays bought to the one the robber took from Dominique. With Williams's testimony, the State put the spoils of the robbery in defendant's hands.

¶ 102       During the investigation into Kevin's murder, an ASA interviewed Williams, typed up his statement, and had Williams verify its accuracy before signing it. At trial, the State questioned Williams about portions of it, then called the ASA who took it and entered the handwritten statement into evidence. Later, during jury deliberations, the jury asked for a copy of the statement; after consulting with the parties, the court sent back a redacted copy.

¶ 103       Before us, defendant argues that the State used this statement to improperly bolster Williams's testimony and credibility. He believes the statement was both hearsay and improperly used as a prior consistent statement. He further claims the court erred when it allowed the jury to

see the statement during deliberations.

¶ 104    Generally, a hearsay statement—an out-of-court statement offered for the truth of the matter asserted—is not admissible unless the statement falls within a recognized exception to the hearsay rule. *People v. Caffey*, 205 Ill. 2d 52, 88 (2001).  And a party may not corroborate a witness's trial testimony by admitting a prior statement that is consistent with that testimony. *People v. Heard*, 187 Ill. 2d 36 (1999). Such a statement is inadmissible hearsay and may not be used to bolster a witness's credibility. *People v. Belknap*, 396 Ill. App. 3d 183 (2009).

¶ 105    But the record reveals that the State did not seek to use Williams's handwritten statement as a prior consistent statement, but rather a prior *inconsistent* one.

¶ 106    Both our rules of evidence and state law allow a party to use a witness's prior inconsistent statement as substantive evidence in certain circumstances. See Ill. R. Evid. 801(d)(1)(A) (eff. Oct. 15, 2015); 725 ILCS 5/115-10.1 (West 2018). This rule applies to cases where a witness initially cooperated with law enforcement and made a statement incriminating the defendant, but later changed positions from, disavowed, or disowned their prior statement. *See People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 42. The decision to admit a prior inconsistent statement rests with the trial court's sound discretion. *People v. Flores*, 128 Ill. 2d 66, 87-88 (1989).

¶ 107    We are again handicapped by the fact that the defendant has not included either the complete handwritten statement or the redacted version the jurors saw in the record. So absent clear evidence to the contrary, we will again presume the court heard sufficient evidence and argument to support its decision that the statement was admissible. *Ramos*, 295 Ill. App. 3d at 525. Defendant has also not identified which statements he believes were prior consistent ones; instead, he seems to believe all of Williams's trial testimony was consistent with his handwritten

statement, and thus the admission of any of the handwritten statement was error.

¶ 108    Williams's trial testimony did not completely contradict his earlier version. He did testify consistently to the basics: that he picked defendant up after the robbery, took him to the store at 63rd and Racine, and sold a gold iPhone the defendant gave him. But Williams was also evasive at trial; he denied knowing the defendant's nickname, seemed to forget several details, and was less cooperative the longer he was on the witness stand. He also alleged that the police promised him lenient treatment if he cooperated, suggesting he was coerced into making the statement to the ASA.

¶ 109    A witness's prior statement does not need to directly contradict his trial testimony for it to be considered "inconsistent" as Section 115-10.1 contemplates it. *People v. Flores*, 128 Ill. 2d 66, 87 (1989). "Inconsistent" can encompass evasive answers, silence, or a change in position. *People v. Grayson*, 321 Ill. App. 3d 397, 409 (2001). However, the State may not attempt to bolster a witness with a prior consistent statement under the guise that there are some inconsistences between it and their trial testimony. *See People v Mitchell*, 225 Ill. App. 3d 708, 716 (1992), *overruled on other grounds by People v. Bowen*, 183 Ill. 2d 103 (1998).

¶ 110    Here, Williams was evasive and shifted position on several details, so his testimony was "inconsistent" for Section 115-10.1 and Rule of Evidence 801's purposes. For example, at trial, Williams denied knowing what defendant's nickname was. Yet in his handwritten statement, he not only knew it was "Little Vino" but referred to defendant by it numerous times. When the State tried to specify what kind of phone the defendant gave him, Williams was noncommittal and evasive, despite being detailed in his prior statement.

¶ 111    Williams also testified at trial—unprompted—that a detective told him that if he helped with the murder case, the detective would "let him off" of the case for which he had been

arrested. Williams then said he "thought" about the gold iPhone only after the detective "brought something up about a phone." Williams clearly insinuated that he was putting the stolen phone in the defendant's hands because the detective promised him lenient treatment on the case for which he had been arrested. But in the handwritten statement, he claimed he had *not* been promised anything in exchange for the statement.

¶ 112    The instructions the court gave the jury also support our conclusion. During the instructions conference, the State asked the court to instruct the jury with Illinois Pattern Instruction-Criminal (IPI) 3.11, appropriately titled "Prior Inconsistent Statements." Notably, when asking the court to give IPI 3.11, the State referenced Williams's handwritten statement, and defendant did not object to this instruction. Though he now complains that giving this instruction exacerbated the statement's improper admission, he has forfeited this challenge, if not affirmatively waived it. See, *e.g.*, *People v. Barnett*, 173 Ill. App. 3d 477, 486 (1988).

¶ 113    The State also discussed the instruction with the jury during its rebuttal closing argument. Responding to the defendant's argument that Williams was unreliable and unbelievable, the State pointed out that the jury could consider his prior statement "as if that's what he said sitting in [the witness] chair" after reading IPI 3.11 aloud. Although defendant also takes offense to this comment, there was nothing improper about it, as the portions of the statement that were admitted were a prior inconsistent statement the jury could consider as substantive evidence.

¶ 114    And last, when the jury asked for a copy of the statement to review during deliberations, the State pointed out that "the consistent portions would need to be redacted." The parties and the court appeared to take care to redact anything that was consistent with his trial testimony and would improperly bolster Williams's credibility.

¶ 115    In sum, Williams's trial testimony was "inconsistent" with his handwritten statement, such that the State could properly admit portions of that handwritten statement as substantive evidence. Since the defendant has not identified which parts of the admitted statement were consistent with Williams's trial testimony, nor has he included the handwritten statement itself in the record on appeal, we presume the court properly admitted it. We find no error here.

¶ 116                          III. Challenges to Sentence

¶ 117    Defendant argues that his sentence must be set aside and asks us to either remand this case for a new sentencing hearing or reduce the sentence ourselves.

¶ 118                          A. Consecutive Sentences

¶ 119    We begin with defendant's claim that the court erred when it ordered the murder and armed robbery sentences to run consecutively. He argues that the armed robbery was a lesser-included offense of the murder, and in Illinois, those crimes had to merge into one charge (felony murder) for sentencing.

¶ 120    His reasoning is as follows: One of the counts he was convicted of was felony murder, and the underlying predicate felony was the armed robbery. Under our state's one-act, one-crime rule, a defendant cannot be convicted and sentenced on both felony murder and its predicate felony. *See People v. Smith*, 233 Ill. 2d 1, 17 (2009).

¶ 121    That principle of law is true, but it does not apply here, for the simple reason that defendant was not ultimately convicted of felony murder—he was ultimately convicted of intentional murder.

¶ 122    Recall that defendant was charged with all three forms of first-degree murder—intentional, strong-probability, and felony murder. See 720 ILCS 5/9-1(a) (West 2014). Though defendant was only accused of a single act of murder, the State was well within its rights to

charge all three forms of murder. See *Smith*, 233 Ill. 2d at 16 ("While our statute describes three 'types' or murder, first degree murder is a single offense.")

¶ 123     Recall as well that the jury was given a general verdict form that did not distinguish between the three forms of murder charged. Defendant would have been within his rights to request separate verdict forms but did not. *Smith*, 233 Ill. 2d at 23. So when the jury returned a general verdict of guilty on first-degree murder, defendant was deemed guilty of each first-degree murder count charged. *People v. Morgan*, 197 Ill. 2d 404, 448 (2001). But because the one-act, one-crime rule does not allow multiple convictions for a single offending act, defendant was presumed to be convicted of (and sentenced on) only the most serious offense charged—that of intentional murder—while the other first-degree murder convictions merged into that more serious count. *See People v. Davis*, 233 Ill. 2d 244, 265 (2009).

¶ 124     Simply put, the rule that a defendant may not be sentenced both for felony murder and the underlying predicate felony has no application here, as defendant was convicted of intentional murder. Obviously, armed robbery is neither a lesser-included offense of, nor a predicate for, intentional murder (which does not *have* predicate offenses; predicates apply only to felony murder). We find no one-act, one-crime violation here in the consecutive sentencing.

¶ 125                         B. Multiple Firearm Enhancements

¶ 126     Defendant next argues that imposing the 15-year firearm enhancement on both the murder and armed robbery counts violates the one-act, one-crime doctrine and the due process clause of the United States Constitution (U.S. Const. amend XIV) because he only possessed a single gun. But our supreme court has already rejected a similar challenge in *People ex rel. Alvarez v. Gaughan*, 2016 IL 120110.

¶ 127     In *Alvarez*, the defendant was convicted of two counts of aggravated criminal sexual

assault based on the separate acts of oral and vaginal contact with the victim. *Id.* ¶ 3. Because the defendant brandished a single firearm during the offenses, the State argued that he was subject to a 15-year sentence enhancement on each count. *Id.* The trial court believed the enhancement could only be applied once (as defendant here argues). *Id.* When the State sought a writ of *mandamus* to compel the trial court to impose the mandatory enhancement to each of defendant's conviction, the Supreme Court reversed. *Id.* ¶ 12. In doing so, it adopted the position that "two convictions, based on two separate acts of sexual penetration while armed with a firearm, warrant the imposition of two separate sentence enhancements, one for each offense." *Id.* ¶ 11.

¶ 128    In Illinois, a defendant cannot be convicted of multiple crimes if they are based on precisely the same physical act. *People v. Rodriguez*, 169 Ill. 2d 183, 188 (1996). But defendant here was guilty of two separate acts—the act of robbing Kevin and Dominique, and the act of Kevin's murder. The firearm enhancement adds an additional penalty to each criminal *act* for which the defendant is convicted. Since it is based on the separate acts of armed robbery and murder, it does not violate the one-act, one-crime doctrine, nor does it violate due process.

¶ 129    Tangentially, defendant also complains that the evidence he possessed a firearm was "weak." But a one-act, one-crime analysis does not hinge on the strength of the evidence; and regardless, we have already found the evidence sufficient to find defendant guilty of armed robbery and murder by accountability. Defendant has not separately challenged the sufficiency of the evidence to support the jury's conclusion that the defendant was armed with an actual firearm during the offense.

¶ 130    Along those lines, defendant also claims that the court should not have imposed the 15-year firearm enhancement on both the murder and the armed robbery because the jury was only asked about the firearm enhancement with regard to the murder charge. That is, the jury was

asked in a separate interrogatory whether the State proved that the defendant was armed with a firearm when he (or someone for whom he was accountable) committed the murder. But there was no separate interrogatory for the armed robbery charge.

¶ 131    Defendant is mistaken. As to the first-degree murder charge(s), the jury was required to find that defendant was armed in a separate interrogatory because the presence of a firearm is not an element of first-degree murder and must be separately proven. See 730 ILCS 5-8-1(a)(1)(d)(i) (West 2014); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *People v. Reed*, 296 Ill. App. 3d 636, 645 (2009).

¶ 132    The flavor of armed robbery the defendant was charged with, meanwhile, incorporates the firearm allegation into the elements of the offense. 720 ILCS 5/18-2(a)(2), (b) (West 2018). This crime is called "armed robbery" but, in operation, "armed robbery with a firearm" may be a more accurate description of the crime. See, *e.g.*, *People v. Spencer*, 2014 IL App (1st) 130020, ¶ 39 (noting that armed robbery with firearm is distinct crime from other forms of armed robbery.)

¶ 133    The jury here was instructed with Illinois Pattern Instruction 14.06. That instruction told the jury that it could only find the defendant guilty of armed robbery if it found that the State proved "that the defendant, or one for whose conduct he is legally responsible, carried on or about his person or was otherwise armed with a firearm at the time of the taking." When the jury found the defendant guilty of armed robbery, it necessarily found that he carried a firearm during the commission of the offense. There was no need for a separate interrogatory.

¶ 134    So, contrary to defendant's claim, the jury found that he was armed with a firearm during both the murder and the armed robbery. The court properly imposed the 15-year firearm enhancement on both charges.

¶ 135                                    C. Finding of Great Bodily Harm

¶ 136        Next, defendant claims the trial court erred when it made a special finding at

sentencing that the defendant committed great bodily harm to a victim when he committed armed

robbery against Dominique. With the special finding, the defendant must serve at least 85

percent of the armed robbery sentence; without it, he would only have to serve 50 percent. See

730 ILCS 5/3-6-3(a) (2)(iii), (2.1) (West 2018).

¶ 137        While Dominique was not physically injured, it ultimately does not matter. A plain

reading of the law indicates that if the court finds that the defendant's conduct (or, as in this case,

another party's conduct the defendant is accountable for) "resulted in great bodily harm to *a*

*victim,*" the defendant must serve 85 percent of any resulting sentence on the convicted armed

robbery charge. (Emphasis added.) 730 ILCS 5/5-4-1(c-1) (West 2018); see 730 ILCS 5/3-6-

3(a)(2)(iii) (West 2018) (also using phrase "a victim.")

¶ 138        Like any other words in a statute, the articles matter. *People v. Hayden*, 2018 IL App

(4th) 160035, ¶ 122. And there is a big difference here between an indefinite and definite article.

" 'The' is a restrictive term; it indicates that 'a following noun or noun equivalent refers to

someone or something previously mentioned or clearly understood from the context or the

situation.' … Thus, a principle of statutory construction is that 'the definite article "the"

particularizes the subject which it precedes. *It is a word of limitation as opposed to the indefinite*

*or generalizing force of "a" or "an." '* (Emphasis added, internal quotation marks omitted.)

*Sibenaller v. Milschewski*, 379 Ill. App. 3d 717, 722 (2008).

¶ 139        It follows, then, that the phrase "a victim" is more inclusive than the phrase "the

victim" would be. *Compare Hayden*, 2018 IL App (4th) 160035, ¶ 124 ("The definite article in

'the victim' is a restrictive word[.]" (Internal quotation marks omitted)). Here, by using "a"

instead of "the," the law applies when *any* victim suffers great bodily harm during the course of the armed robbery. The trial court found that Kevin suffered great bodily harm when he was shot and killed. That finding was proper, and defendant must serve 85 percent of the sentence on the armed robbery counts.

¶ 140                              D. Evidence at Sentencing

¶ 141     We now turn to defendant's sentence itself. Defendant claims the court ignored the "substantial mitigating evidence" he presented to it, improperly considered certain evidence in aggravation, and imposed an excessive sentence.

¶ 142     We take his first two arguments—that the court did not consider mitigating evidence and that it improperly considered evidence in aggravation—together. The trial court has broad discretion in fashioning an appropriate sentence. *People v. Jones,* 168 Ill. 2d 367, 373 (1995). "A reasoned judgment as to the proper sentence to be imposed must be based upon the particular circumstances of each individual case and depends upon many factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age." *People v. Donath,* 357 Ill. App. 3d 57, 72 (2005). "The defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment are all factors to be considered in fashioning a sentence." *Id.* at 72. "There is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and the court is presumed to have considered any evidence in mitigation which is before it." *Id.* We may vacate or reduce a sentence only if the trial court abused its discretion. *Jones,* 168 Ill. 2d at 373-74.

¶ 143     First, defendant's claim that the court did not consider mitigating evidence he presented to it is plainly rebutted by the record. The defendant offered evidence that highlighted

his troubled upbringing—starting with the fact that his mother gave birth to him in a toilet. He struggled in school and attempted suicide numerous times. Before us, he says the court did not adequately consider this information before passing final judgment.

¶ 144        But the court acknowledged these facts when it resentenced defendant, most likely because defendant called his grandmother to testify about his upbringing. In fact, the court said her testimony "is basically how I suspected" defendant's upbringing was. On the other hand, the court said, there was "no evidence before me that affected his ability to understand, perceive what was right from wrong and how to correct and conform his actions[.]" Despite defendant's contention here that the court did not consider the mitigation evidence he gave it, the court not only acknowledged it but balanced it appropriately with the aggravating facts of the case.

¶ 145        Defendant objects to this last point because he believes the court inverted his mitigating evidence and instead considered it as aggravation. He argues that the court punished him for "controlling his behavior while in court even though his background clearly indicated he is unable to do so at times." This warps the court's comments beyond recognition. The court was not punishing the defendant for being well-behaved in court; it was pointing out that it was not particularly swayed by defendant's argument. The court recognized that defendant's upbringing was hard but noted that there was no evidence that his upbringing so affected his ability to know right from wrong that it excused or justified his role in the robberies and murder. This is hardly flipping the evidence on its head. Defendant has not overcome the strong presumption that the court based its sentence on proper legal reasoning. We find no abuse of the court's discretion.

¶ 146                          E. Excessive Sentence

¶ 147        Defendant also challenges the length of his sentence, arguing that the court "abused its discretion" and violated the federal eighth amendment (U.S. Const. amend VII) and the

Illinois proportional penalties clause (Ill. Const. 1970, art. I, §8) when it sentenced defendant to an aggregate 80-year prison sentence. While it is not clear if the this is a constitutional challenge to his sentence or just an argument of excessiveness, neither claim has any merit.

¶ 148    As to the constitutionality of his sentence, our supreme court has been unequivocal that the protections the eighth amendment affords juvenile defendants, as enumerated in *Miller v. Alabama*, 567 U.S. 460 (2012), do not apply to defendants who are 18 years old or order. *See People v. Harris*, 2018 IL 121932, ¶ 61. Since defendant fell on the adult side of that line when the crimes were committed, if only by a few weeks, the *Miller* protections are of no use to him. *Id.*

¶ 149    We also must reject, at this stage, any challenge to his sentence under our proportionate penalties clause, as the supreme court has been equally as explicit that this claim is best made in collateral postconviction proceedings, where the defendant can develop a comprehensive record to support it. *Harris*, 2018 IL 121932, ¶ 48; *People v. House*, 2021 IL 125124, ¶¶ 28-32.  While defendant presented significant mitigating evidence seeking a lenient sentence, he did not present evidence targeting the constitutionality of his sentence, and the trial court did not make any findings of facts on this defendant's specific circumstances in relation to our proportionate penalties clause. *See Harris*, 2018 IL 1121932, ¶¶ 39-40; *People v. Rizzo*, 2016 IL 118599, ¶ 26.  It would certainly be in defendant's best interests to direct a fully developed argument to a court on postconviction review, rather than have us decide this constitutional claim here on a record that, while not void of relevant information, is not as developed as it should be. It " 'is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " *Harris*, 2018 IL 121932, ¶ 39 (quoting *People v. Hartrich*, 2018 IL 121636, ¶ 31).

¶ 150     The constitutional challenges aside, we do not find the sentence to be excessive. As noted, the trial court has broad discretion when imposing a sentence, and those decisions are entitled to great deference. *Id.* We will reverse or alter a defendant's sentence only if the trial court abused its discretion. *Id.* The court abuses its discretion when the sentence it imposes is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000).

¶ 151     All factors considered, the sentencing range here was between 56 and 120 years. See 730 ILCS 5/5-4.5-20 (West 2014) (first-degree murder is punishable by between 20 and 60 years in prison); 730 ILCS 5-8-1(a)(1)(d)(i) (West 2014) (15-year firearm enhancement if defendant was armed with firearm during murder); 720 ILCS 5/18-2(b) (West 2014) (armed robbery with firearm is Class X felony for which 15 years shall be added onto term of imprisonment); 730 ILCS 5-4.5-25(a) (West 2014) (Class X felony is punishable between 6 and 30 years in prison.)

¶ 152     The trial court properly exercised its discretion when it imposed an 80-year sentence on defendant. A sentence that falls within the statutory range is presumed proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 47. Defendant robbed two people at gunpoint, and that robbery was the starting point for the brutal and senseless act of his co-offender. While defendant did not fire the fatal shot into Kevin Baker, he was armed and played a role in Kevin's death. The jury found him guilty of not just the murder and armed robberies, but also of being armed with a firearm during the crimes, triggering 15-year firearm enhancements on both charges.

¶ 153     The court's sentence of 25 years for the murder, totaling 40 with the firearm add-on, was on the lower end of the permissible range. And while the armed robbery term was closer to the middle of the range, the court's sentence there reflects the fact that, although the defendant was only accountable for the murder, he personally robbed the Bakers. All in all, we cannot say

the court abused its discretion in fashioning this sentence.

¶ 154    The court also did not abuse its discretion when it did not use Section 5-4.5-105 of the Code of Corrections when it sentenced defendant. Section 5-4.5-105 makes various firearm enhancements discretionary as opposed to mandatory for defendants who are younger than 18 years old at the time of their offense. 730 ILCS 5/5-4.5-105(b) (West 2018). But by defendant's own admission, he was past his 18th birthday, albeit by a matter of weeks, when he participated in the robbery and murder. Section 5-4.5-105 does not apply to him.

¶ 155                                    CONCLUSION

¶ 156    We affirm defendant's conviction and sentence.

¶ 157    Affirmed.